EIKENBARY ET AL., APPELLANTS, *v.* CITY OF DAYTON, APPELLEE.
BEERMAN ET AL., APPELLANTS, *v.* CITY OF DAYTON, APPELLEE.

[Cite as Eikenbary v. City of Dayton, 3 Ohio App. 2d 295.]

296

(Nos. 2870 and 2871—Decided December 2, 1964.)

*Messrs. Coolidge, Wall & Wood* and *Messrs. Turner, Wells, Granzow & Spayd,* for appellants.

*Mr. Herbert S. Beane,* city attorney, *Mr. W. Erwin Kilpatrick, Messrs. Squire, Sanders & Dempsey, Mr. John Lansdale* and *Mr. Eben Crawford,* for appellee.

SHERER, J. These actions have been consolidated for the purposes of this appeal. The actions are taxpayers' suits challenging various steps taken and to be taken by the city of Dayton in the execution of two urban renewal projects, the Miami-Maple and the Perry-Mead projects. These projects together comprise about fifty-two acres of land in the western downtown area of the city of Dayton, which the city of Dayton proposes to sell to a single developer for the purpose of redevelopment.

The trial court resolved all issues in these cases in favor of the city of Dayton and against the claims of the taxpayers, appellants herein. It is from such judgments that these cases are here on appeal on questions of law.

Appellants assign as error on the part of the court below the following rulings:

(1) That the area between Second Street and Lowe Lane was included properly within the Miami-Maple Urban Renewal Project;

(2) That there was no abuse of discretion by the city in determining what properties were to be excluded from the appropriation program for the Miami-Maple Urban Renewal Project;

(3) That the proposed single developer bidding procedures are lawful and do not stifle competition;

(4) That there has been no bad faith or abuse of discretion on the part of the city in formulating and carrying out the Perry-Mead and Miami-Maple Urban Renewal Projects.

In their argument, appellants apparently are not contending that the city of Dayton has shown bad faith or has abused its discretion in formulating and delineating the Perry-Mead project but do contend that, with reference to that project, the city is abusing its discretion by applying thereto the single developer bidding procedure. In their brief, appellants say that their case is based upon these three principal points:

(1) It was a gross abuse of discretion to include the unblighted 12.5 acre tract lying between Second Street and Lowe Lane in the Miami-Maple project;

(2) There was a gross abuse of discretion upon the part of the city in formulating its exclusion program—referring primarily to the Lorenz parking lot;

(3) The single developer bidding procedures violate the requirements of the Dayton Charter.

The area embraced within these projects has been designated by the city of Dayton for redevelopment, which means that all structures, excepting on those individual parcels excluded therefrom by the city, are to be cleared of buildings and are to be redeveloped with changes of streets, etc. Appellants do not argue that the Miami-Maple project, delineated in Ordinance 20357, Exhibit 94, which includes the 12.5 acre tract to which

the first assignment of error is directed, does not qualify for such redevelopment under the criteria laid down by the federal government, which are applicable here because the federal government is assisting the city to finance the project.

The issue on this point in the trial court was made by appellants' pleading in their cause of action X in their second amended petition, case No. 123559 in the Common Pleas Court, and case No. 2871 in this court, and the general denial filed by the city of Dayton. Appellants' cause of action X in their second amended petition is as follows:

"The execution of the Miami-Maple Urban Renewal Project will constitute a flagrant waste and misuse of the tax revenues of the city of Dayton, since a major portion thereof, to-wit: that portion thereof fronting on Second Street and north thereof to Lowe Lane is not a blighted area, as defined in the applicable statutes made and provided therefor, but rather such portion has been experiencing dynamic economic growth in that: (1) building permits totaling in excess of five million dollars have been issued for new construction on the properties fronting on that part of First Street lying within the Miami-Maple Urban Renewal Area within the past thirteen years, and (2) the owners of a substantial part of the properties fronting on Second Street within such Urban Renewal Area are ready and willing to redevelop their properties, at their own expense, and would be doing so presently but for defendant's policy of refusing the issuance of building permits therefor. Further, the construction of Interstate Route 75 and the County Court Center will provide additional stimuli to the development of the First Street and Second Street district.

"In consequence of the foregoing it was necessary for defendant to gerrymander the Miami-Maple Urban Renewal Area by including therein the sub-standard structures south of Third Street and west of Charter Street, which logically would have constituted part of the Perry-Mead Urban Renewal Project. Such gerrymandering constitutes a gross abuse of discretion on the part of the Dayton City Commission."

The appellants' first and fourth assignments of error will be considered together as they relate to the Miami-Maple Urban Renewal Project.

We have noted that appellants do not argue in this appeal that there has been bad faith or an abuse of discretion on the part of the city in formulating and carrying out the Miami-Maple Urban Renewal project, but argue that the trial court erred in determining that the city did not abuse its discretion in including the 12.5 acre tract between Second Street and Lowe Lane within such project. Specific objection was made to the inclusion of properties on the north side of West Second Street and on the north and south sides of West First Street.

In 1958, the city of Dayton slated three areas for clearance and redevelopment, as that term is defined in defendant's Exhibit 6, Section 1(e), which refers to Section 1(d), paragraphs 1, 2, 3 and 4. None of these areas included the area north of the government center within the 12.5 acres which is under discussion here and which area was marked out for rehabilitation as that term was defined in defendant's Exhibit 6, Section 1 (f), which refers to Section 1 (d), paragraphs 3, 4, 5 and 6. The Perry-Mead project, as once slated, was bounded on the south by Mead Street and on the north by Third Street (defendant's Exhibit 11). Part of the proposed Perry-Mead project was removed from the area, and the northern boundary was moved to Maple Street south of Third Street and the area south of Third Street, north of Mead Street, was subsequently included in the Miami-Maple project as delineated in Ordinance 20357, Exhibit 94. It is this change of boundaries which prompted appellants, when in the court below, to charge the city with "gerrymandering" for the purpose of making the Miami-Maple project eligible for federal assistance. It is in evidence that, without the inclusion of the area south of Third Street, formerly in the Perry-Mead project, the Miami-Maple project probably would not qualify for federal assistance for clearance and redevelopment.

We are unable to agree that the city's action in changing the boundary line was either motivated by bad faith or that it constituted an abuse of discretion. Defendant's Exhibits 15, 20 and 57 indicate that the city of Dayton was forced to accept less from the federal government for the Perry-Mead project than requested because of a shortage of federal funds, and that the city eliminated this area south of Third Street from

the Perry-Mead project area to keep within the federal allotment and to avoid bearing the expense of clearing the area removed.

Subsequent to the removal of the area between Third Street and Maple Street from the Perry-Mead project, the city of Dayton adopted Ordinance 20357, Exhibit 94, delineating the area to be encompassed in the Miami-Maple project, including therein the area south of Third Street removed from the Perry-Mead project and, without any further study of the area north of the government center previously designated for rehabilitation, included that area in the Miami-Maple project.

It is conceded in argument and established by the evidence that the Miami-Maple project, as delineated by Ordinance 20357, qualifies as an area for clearance and redevelopment by meeting the criteria laid down by the federal government and the city of Dayton, defendant's Exhibit 6, Section 1(e), for such project.

The question is whether the city has shown either bad faith or an abuse of discretion in including this 12.5 acres within the Miami-Maple project. The evidence with respect to this tract is such that it could not qualify for clearance and redevelopment, standing alone.

The ordinance establishing the Miami-Maple project and the Report of the Plan Board's Study of this project area discloses that the proposed redevelopment of this area contemplates the acquisition by the city of the property located in the area, the elimination of slum and blighted conditions therein by clearing therefrom the buildings and making the land available for redevelopment, and the subsequent sale of the land for redevelopment with restrictions as to its use which will insure against the recurrence of any other slum or blighted conditions, and further discloses that the primary purpose of the redevelopment of this area is to eliminate the slum and blight and *prevent their recurrence.*

In *State, ex rel. Bruestle, City Solicitor,* v. *Rich, Mayor,* 159 Ohio St. 13, in paragraph eleven of the syllabus, the Supreme Court held that:

"An area may constitute a slum area even though a small percentage of the buildings within the area are not substand-

ard buildings and a small percentage of the area constitutes vacant land. The acquisition of such buildings and such vacant land may be reasonably necessary in order to clear such slum area and prevent recurrence of slum conditions therein.''

The evidence indicates that there are approximately thirty-six acres of land within the Miami-Maple project and that a slum condition, deterioration and blight are widespread within the area. It is likewise true that during the past few years private capital has provided a substantial number of new buildings and has rehabilitated a substantial number of others within the 12.5 acre area, converting them to use as office buildings. The city has excluded the new buildings and some vacant land in the area from the Miami-Maple project.

Having determined to renew the area embraced within the Miami-Maple project, the city adopted a plan qualified to accomplish this purpose. Exhibit 88. The plan was based upon and supported by studies made by the City Plan Board, Exhibit 66, and by Morton Hoffman, Urban and Economic Consultant, Exhibit 47. As a result of these studies, the city abandoned any idea of rehabilitating the residential area within the project embraced within the 12.5 acres herein questioned, and the continued use of such area as a residential area, and determined to include within the project for clearance and redevelopment that area previously designed for rehabilitation. From a consideration of the data revealed by these studies, the city concluded that the execution of the plan makes it reasonably necessary that buildings within the project area be demolished, land cleared and graded, and that streets and utilities be rearranged. During this process, any private use of property within the area not co-ordinated with and controlled by the city probably would not be in the public interest. There are many individual owners of tracts within the 12.5 acre area. Some probably would redevelop their parcels to conform to the city's plan for the redevelopment of surrounding areas. Others would not. The evidence supports the city's conclusion that it is reasonably necessary to include the 12.5 acre tract within the project area in order to effect a renewal of the entire area and to prevent the recurrence of blighted and slum conditions. The city gave some consideration to aesthe-

tics and civic beauty in the preparation of its renewal plan. In *Berman et al., Exrs.,* v. *Parker,* 348 U. S. 26, 33, the Supreme Court said:

"We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. See *Day-Brite Lighting, Inc.,* v. *Missouri,* 342 U. S. 421, 424. The values it represents are spiritual as well as physicial, aesthetic as well as monetary. It is within the power of the legisature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's Capitol should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way."

At pages 35 and 36, the court said that:

"It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch. * * *"

"Abuse of discretion" so as to permit a judicial review of a legislative or administrative determination has been defined by the Suprme Court in *State, ex rel. Shafer,* v. *Ohio Turnpike Commission,* 159 Ohio St. 581. At pages 590 and 591, the opinion of the court quotes with approval the following:

" 'The exercise of an honest judgment, however erroneous it may seem to be, is not an *abuse of discretion.* Abuse of discretion, and especially gross and palpable abuse of discretion, which are the terms ordinarily employed to justify an interference with the exercise of discretionary power, implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency. ' * * *"

We conclude from the documentary evidence above described and all other evidence contained in the record that the trial court did not err in determining that the city of Dayton

did not act in bad faith and did not abuse its discretion in the delineation of the area to be embraced within the Miami-Maple Urban Renewal Project, and in including therein the 12.5 acres here in dispute. Assignments of error 1 and 4 are without merit.

The second error assigned is that the trial court erred in ruling that there was no abuse of discretion in the determination of what properties were to be excluded from the appropriation program for the Miami-Maple Urban Renewal Project.

Appellants first specifically object to the exclusion of the Lorenz parking lot at the corner of West First and Perry Streets. The record indicates that the city's action in excluding this parcel was taken upon the recommendation of its planners as to what properties should be acquired or excluded from the acquisition, based upon the following criteria:

"1. Whether or not the parcel contains a blighted structure;

"2. Whether or not the parcel is large enough to prevent a recurrence of blight;

"3. Whether or not the parcel should be acquired for the purpose of eliminating the obsolete street pattern in the area;

"4. Whether or not the parcel could be assembled with contiguous property to make a desirably large disposition parcel."

The record indicates that the Lorenz parcel does not contain a blighted structure; that its acquisition is not necessary to eliminate an obsolete street pattern in the area and that it is not large enough to assemble with contiguous property to form a desirably large disposition parcel. Mr. Flynn testified that there was no need to acquire this parcel for the purposes of urban renewal. The record discloses that each of the other vacant parking lots in the area mentioned in appellants' brief is either contiguous to parcels upon which there are blighted structures or could be assembled with contiguous parcels to form a desirably large disposition parcel. The burden is upon appellants to produce facts from which it can be concluded that the city has abused its discretion. No such facts have been disclosed. Furthermore, appellants, as taxpayers, have no right to claim such discrimination in this action. The evidence in the record supports the city's action excluding the Lorenz

property while acquiring the other vacant parking lots mentioned in appellants' brief. The evidence discloses that completion of the expressway and the orderly redevelopment of the Miami-Maple project area render the street pattern in the area absolute. The evidence shows the necessity for widening some streets, vacating others and building new ones to insure proper movement of traffic throughout the area.

We conclude that the Common Pleas Court did not err in determining that the city did not abuse its discretion in excluding the property which is the subject of this assignment of error.

The third error assigned is that the trial court erred in holding that the proposed single developer bidding procedures are lawful and do not stifle competition.

Before final approval of the Central Business District Urban Renewal Project, the city, at the suggestion of the federal government, held a public hearing on its plan in May 1963. At this hearing several owners of land within the area appeared and voiced objection to the taking of their land and urged that they be allowed to redevelop their parcels.

After the public hearing, the city, by a resolution passed June 19, 1963, Exhibit 124, determined that the public interest would best be served by carrying forward the redevelopment of the two project areas as quickly as possible by obtaining maximum intensity of building development as would produce maximum tax return, and that the city was not adequately staffed to achieve these goals. The city then concluded that offering all urban renewal land in the projects as a single development would best serve the citizens of Dayton.

The resolution of June 19, 1963, in part, provides that:

"Item 2. In offering the central business district urban renewal land area as a single development unit, all prospective local and national developers will be encouraged to submit proposals on a competitive basis."

"Item 4. Special consideration will be given to present owners of property in the central business district urban renewal area who desire to redevelop their own properties."

Appellants do not challenge the legality of the single developer approach to the proposed redevelopment. Rather, they challenge the legality of the bidding procedures adopted to

achieve the goals set forth in the resolution of June 19, 1963, Exhibit 124.

Following the adoption of this resolution of June 19, 1963, the city contacted by letter more than 175 persons, Exhibit 127, specifically requesting comments and suggestions as to the proposed bidding procedures in which Item 8, relating to factors for selecting the redeveloper, reads:

"The extent to which the redeveloper can include existing property owners in his plan who have expressed a desire to redevelop in the area."

A response from the Midwestern Land Development Corporation, in July 1963, contained this suggestion:

"Item 8 seems to us a little vague. To what extent have other property owners expressed desires to develop portions of the site? If there are a large number of isolated parcels within the area which must be allocated to existing property owners for redevelopment, we would feel that the desirability of an over-all redevelopment of the area might be seriously impaired. The undertaking of a major redevelopment such as the one proposed, requires comprehensive and integrated planning to meet economic as well as aesthetic qualifications. A patchwork plan built around a large number of isolated plots to be redeveloped by existing property owners, makes a difficult, if not impossible, job for a redeveloper."

Item 8 is similar to Section 6, Item H, in Ordinances 20906 and 20907, adopted by the City Commission on August 28, 1963, and to Item 6 (H) in defendant's Exhibit 135, the bidding documents for real property offered for sale in the Perry-Mead and Miami-Maple Urban Renewal areas. These ordinances, insofar as pertinent to the question before us, are identical. At page 2, Section 2, of the ordinances, the City Commission provided:

"That this commission * * * hereby establishes the specifications, rules and regulations hereinafter set forth to govern the opportunity for competition to be given to prospective purchasers by the City Purchasing Agent before such real property is sold by the city."

Section 6 therein provided:

"The bid will be accepted and a project agreement awarded to the bidder, who in the opinion of the City Commission will

best develop the real property in accordance with the aforesaid urban renewal plan. The City Commission reserves the right to weigh the value of all appropriate elements and factors, individually and collectively in such manner as the commission considers best meets the objectives of the urban renewal plan and the interests of the city and reserves the right to consider and determine all elements entering into the question of determining the responsibility of such bidder. Included among the elements and factors to be considered by the City Commission are the following:

"A. The qualifications and experience of the redeveloper;

"B. The financial capability of the redeveloper and his ability to arrange financing;

"C. The economic soundness of the proposal and measure of community return;

"D. The price to be paid for the land;

"E. The time schedule for taking title to the land and completing the redevelopment;

"F. The quality of the proposal in relation to the design objectives of the Urban Renewal Plan;

"G. The quality of proposal in relation to landscaping and architectural treatment of open areas, buildings, the use of materials, scale and general appropriateness of design;

"H. The extent to which the redeveloper can include existing property owners in his plan who have expressed a desire to redevelop in the area; (all of such property owners' property is presently contemplated to be acquired by the city for disposition) and

"I. The extent to which the proposed redevelopment will complement rather than compete with existing downtown uses."

It is to be noted that Item H differs from Item 8 only in the addition of the clause in parentheses.

In Exhibit 135, the bidding documents for the sale of the land in the urban renewal projects, under Specifications and Instructions to Bidders, pages 1-6, provide, in (3) *Bidding Procedures*, that the bidding is to be in two phases, a preliminary phase and a final phase. It is provided that the necessary items to be submitted for the final plan are, in part, on page 2, as follows:

"E. A site plan, architectural rendering and a scale model

for the total redevelopment area, including the general land use, proposed building masses, architectural treatment, landscaping, plazas, parking areas, pedestrian and vehicular circulation plan.

"F. A time schedule including a description and explanation of the staging plan for taking title to the real property from the city and the construction schedule for completing the redevelopment, as the land becomes available for redevelopment."

It is appellants' first contention that the actions of the city in adopting Ordinances 20906 and 20907, and in adopting the bidding procedures embodied in defendant's Exhibit 135, stifle competition and, therefore, are unlawful.

Sections 84 and 85 of the Charter of the City of Dayton provide, in part:

"Section 84. The City Purchasing Agent shall * * * sell all real estate and personal property of the city not needed or unsuitable for public use or that may have been condemned as useless by the director of a department * * *

"Section 85. * * * Before making any purchase or sale, the City Purchasing Agent shall give opportunity for competition, all proposals to be upon precise specifications, and under such rules and regulations as the commission shall prescribe."

We do not consider these sections of the charter applicable to the sale of land taken by the city for the purpose of urban renewal. Section 84 applies to property "not needed or unsuitable for public use." Land taken by the city for the purposes of urban renewal is taken for a public use. In *State, ex rel. Bruestle, City Solicitor,* v. *Rich, Mayor,* 159 Ohio St. 13, an urban renewal case, it was argued (1) that in order to be a public use there must be a use or right of use on the part of the public, or some limited portion thereof, and (2) that, upon the completion of the redevelopment project involved, no such use will be involved. The Supreme Court said that property taken for an Urban Renewal project is "taken for public use." See also *Gohld Realty Co.* v. *City of Hartford,* 141 Conn. 135, 104 A. 2d 365; and *Velishka* v. *City of Nashua,* 99 N. H. 161, 106 A. 2d 571, 44 A. L. R. 2d 1406.

The method of sale of urban renewal land is left to the discretion of the Dayton City Commission by Section 1 of the City Charter which, in pertinent part, provides as follows:

"The city shall have all powers that now are, or hereafter may be granted to municipalities by the Constitution or laws of Ohio; and all such powers, whether expressed or implied, shall be exercised and enforced in the manner prescribed by this charter, or when not prescribed herein, in such manner as shall be provided by ordinance or resolution of the commission."

It is the further contention of the appellants that Item 6 (H) in the Specifications and Instructions to Bidders, Exhibit 135, and Item 6 (H) in Ordinances 20906 and 20907, defendant's Exhibits 133 and 134, is not specific and is a meaningless crumb thrown to the present owners of land in the project area, and that, as a result, it will stifle competition.

We have noted that the Midwestern Land Development Corporation considered Item 8 vague and concluded that it contemplated the allocation of isolated parcels within the area to existing owners. Two city officials have testified in the court below. One testified as to the meaning of Item 8. One testified that he did not consider this item to be vague. This witness later testified to writing a letter to Midwestern Land Development Corporation on July 10, 1963, in reply to their letter expressing uncertainty as to the meaning of this item, in which he said:

"We agree that Item 8 is a little vague, although it is an attempt to have the redeveloper talk with the various property owners in the area who have expressed a desire to redevelop in the area."

This witness further testified on this point that it would be possible for a bidder to show a proposal which would permit private redevelopment of parcels in the area in addition to those parcels already excluded and that such proposal may be negotiated between the bidder and the city resulting in further exclusions in the area, subject to the city's control, which would be integrated with and consistent with the over-all redevelopment of the area.

Another witness for the city testified with respect to the resolution of June 19, 1963, defendant's Exhibit 124, and with respect to Item (H), as follows:

"The wording here is special consideration, and I have indicated before that we had discussions with the persons who were submitting bids along this line, and indicated to them the

number of persons who now own land in here and express the desire to redevelop, in the hope that they would be able to accommodate these property owners, not on their own property, not that they would be able to keep their property, but we would recognize their needs in the plan and would be able to accommodate them. As I said before, constructing new buildings in the area and giving these existing property owners, in effect, the first option to occupy these dwellings.''

It was developed by the evidence that, prior to the adoption of the resolution of June 19, 1963, at a public hearing in May 1963, this witness, the City's Director of Planning, recommended to the City Commission that ''it could be a real gem'' to permit present property owners in the area to redevelop their own property. The statement of this witness at the public hearing of May 1963 is set forth in the record and is as follows:

''The preceding private property owners, they have indicated their willingness, this was Car-Two, they have indicated their willingness to meeting the redeveloper standards, the proper requirements, the coverage requirements. I think it could be a real gem. I think the commission does have the responsibility, and no decision has been reached on this one way or the other.''

Following the adoption of the resolution of June 19, 1963, and Ordinances 20906 and 20907 here in question, it is a matter of common knowledge in the community that the city advertised for bids under the single developer concept and received but one bid, from the Galbreath organization. It is a matter of common knowledge in the community that in the redevelopment plan submitted by Galbreath no consideration was given to present owners of land in the area who wished to redevelop their own land or land in the area.

The only fair conclusion that can be drawn from the evidence before us is that the city, in the beginning, considered excluding their land from the renewal area and seeking bids which would accord present owners of land the privilege of redeveloping their own land, subject to the city's control which would insure development consistent with the over-all plan to be adopted for the redevelopment of the entire area. It must be concluded also that, when the city's specifications and bidding **procedures** sent to prospective redevelopers evoked objections

which we have herein set forth, the city abandoned the idea of permitting such owners to redevelop their own land because of the likelihood that to do so would destroy the over-all plan and result in no bidders. The city then adopted Ordinances 20906 and 20907, defendant's Exhibits 133 and 134, on August 28, 1963, which substituted Section 6 (H), which included the parenthetical clause hereinbefore set forth, for Item 8 which did not include the parenthetical clause (all of such property owners' property is presently contemplated to be acquired by the city for disposition).

It is argued by counsel for the appellants that this aspect of the city's specifications is so vague and uncertain as to discourage bidders and thereby stifle competition and is, therefore, unlawful.

It must be concluded that the two city officials who testified are not wholly in agreement as to the meaning of either defendant's Exhibit 124 or Item 6 (H) in Ordinances 20906 and 20907, defendant's Exhibits 133 and 134, which coincided with Item 6 (H), Exhibit 135, Specifications and Instructions to Bidders. And we have noted that the Midwestern Land Development Corporation did not interpret this Item 8 as did one of the city officials at the trial in the court below. Furthermore, the Galbreath organization completely ignored the city's expressed desire to require bidders to submit a proposal which outlines "The extent to which the redeveloper can include existing property owners in his plan who have expressed a desire to redevelop in the area." This proposal must contain some consideration of the desires of such present owners to redevelop in the area.

The redevelopment of the area in question is an undertaking of great magnitude and complexity. While the city is offering to sell land for redevelopment, it is at the same time offering to buy a plan for such redevelopment. The plans sought will require much ingenuity and know-how and entail some element of risk. Because the city is buying the skill of a proposed redeveloper, it need not be as precise in its specifications as when buying a fire truck. See *City of Cleveland* v. *Lausche, Mayor*, 71 Ohio App. 273, paragraph three of the syllabus; *Hordin* v. *City of Cleveland*, 77 Ohio App. 491, para-

graph two of the syllabus; *State, ex rel. Doria,* v. *Ferguson, Aud.,* 145 Ohio St. 12, paragraph two of the syllabus.

However, under the ordinances adopted, bidders are required to give consideration in their plans to present owners who wish to redevelop in the area. The city could not give consideration to a bidder's plans for such owners if a bidder did not consider them. Giving first option to such owners to occupy buildings in the area would not comply with the city's policy and specifications expressed in its Ordinances 20906 and 20907, which modify the city's previously expressed policy in its resolution of June 19, 1963, wherein the city had expressed a desire to permit present owners of land in the area to redevelop their own land. If none of the bidders takes the city's expressed wishes in these ordinances of August 28, 1963, into account, there may be some basis for further legal action. Apparently, the city feels some responsibility to such landowners as expressed by Mr. Flynn, Director of Planning.

The only consideration which must be given the present owners of property in the project area by the bidders is the consideration specified by the city in Ordinances 20906 and 20907, defendant's Exhibits 133 and 134, and the bidding documents, defendant's Exhibit 135.

The question is whether the city's Specifications and Instructions to Bidders, particularly Items A to I, inclusive, in the ordinances and bidding documents, hereinbefore set forth, are so vague as to stifle competition, making the bidding procedures unlawful.

The city has specified in its ordinances that the bids must be competitive. The bids, then, must be competitive even though we have held that Sections 84 and 85 of the city Charter are not applicable here. The essence of competition requires that each bidder shall have equal opportunity to secure the objective sought. We have said that the city is at the same time offering land for sale and offering to buy a plan for the redevelopment of the project area. The city is offering to buy ingenuity and skills of prospective redevelopers, and we have said that the city cannot be expected to be precise in the specifications in the plans for the development because the city is buying ideas for the redevelopment. We have no difficulty in concluding that

the Specifications A, B, C, D, E, F, G and I in the city's ordinances and bidding documents do not stifle competition and make the bidding procedures unlawful. However, Item 6 (H) presents some difficult questions. Item 6 provides that:

"The bid will be accepted and the Project Agreement awarded to the bidder, who in the opinion of the City Commission will best develop the real property in accordance with the aforesaid Urban Renewal project. The City Commission reserves the right to weigh the value of all appropriate elements and factors, individually and collectively in such manner as the commission considers best meets the objectives of the urban renewal plan and the interests of the city and reserves the right to consider and determine all elements entering into the question of determining the responsibility of such bidder. *Included among the elements and factors to be considered by the City Commission are the following * * *.*'' (Emphasis ours.)

Item 6 (H), one of the factors to be considered by the city in making the award, provides:

"The extent to which the redeveloper can include existing property owners in his plan who have expressed a desire to redevelop in the area; (all of such property owners' property is presently contemplated to be acquired by the city for disposition)."

The first question which will arise in the mind of a bidder is the identity of existing property owners who have expressed a desire to redevelop in the area. What desires have they expressed to redevelop in the area? How have such desires been expressed? What land in the area is to be redeveloped for them, and when? The latter is of the utmost importance because the evidence indicates that twenty to forty years may be required to redevelop the area. Furthermore, such owners, since they are precluded from redeveloping their own land, will wish to have land redeveloped for them located in the most advantageous position in the area. Whatever is developed and allocated to existing owners will compete with the successful bidder's other developments in the area. How are all these questions to be resolved? There is nothing in the ordinances or bidding documents to advise bidders what present owners of land have expressed a desire to redevelop land in the area, although their names are in the evidence, or what a bidder

is expected to do for them. One bidder may be willing to relinquish an investment in a prime location to such owners, but he has no way of knowing what consideration will be given his plan because the city "reserves the right to weigh the value of all appropriate elements and factors." One of the objectives sought by the city is some consideration in the redeveloper's plan for existing property owners who wish to redevelop in the area. But Item 6 (H) does not sufficiently specify what the city wants bidders to do for them. As long as doubt and uncertainty as to the city's objective in adopting Specification 6 (H) exists, *there can be no equality of opportunity among bidders to secure the objective sought.* No prospective redeveloper will bid on a "pig in a poke" or "buy a lawsuit." It will not suffice to carry on private conversations with one prospective bidder as to the meaning of this item in the specifications to the exclusion of others. The city must spell out more definitely in its ordinances and bidding documents what consideration, if any, bidders are to give to existing owners who wish to redevelop in the area. It cannot be said that a bidder cannot include such owners in his plan, because there are thirty-six acres in the Miami-Maple project and it is in evidence that the redevelopment may take from twenty to forty years to complete. Plans could be devised to include such owners at some place in the area at some time.

While we have held that the sale of urban renewal land is left to the discretion of the City Commission by Section 1 of the city Charter, we must conclude that the city has exceeded its discretionary powers by adopting Item 6 (H) as a specification in its Ordinances 20906 and 20907, and by its inclusion in its Instructions to Bidders, defendant's Exhibit 135, because such item is so vague as to stifle competition in bidding and is, therefore, unlawful.

That part of the judgment of the Common Pleas Court which holds that the action of the Dayton City Commission, in adopting the bidding policies and procedures embodied in Ordinances 20906 and 20907 for the disposition of land within the Miami-Maple and Perry-Mead Urban Renewal projects, do not stifle competition, are lawful and do not exceed the discretionary powers of the city under its Charter, will be reversed. The judgment will, in all other respects, be affirmed. These causes

**314**

will be remanded to the Common Pleas Court with instructions to render judgment holding that such bidding procedures do stifle competition, that the City Commission has exceeded its discretionary powers in adopting them and that such procedure is unlawful. The Common Pleas Court is further instructed to proceed further in considering appellants' prayers for injunctive relief.

*Judgment accordingly.*

KERNS, P. J., and CRAWFORD, J., concur.