THE STATE, EX REL. ALLERTON PARKING CORP. ET AL., *v.* CITY OF
CLEVELAND ET AL.

[Cite as State, ex rel. Allerton Parking Corp., v. City of Cleveland,
4 Ohio App. 2d 57.]

58

(No. 27533—Decided October 21, 1965.)

*Messrs. Arter, Hadden, Wykoff & Van Duzer* and *Mr. William S. Burton*, for relators.

*Mr. Bronis Klementowicz*, director of law, and *Mr. Daniel J. O'Loughlin*, for respondent city of Cleveland.

SILBERT, C. J.   This is an original action brought in this court on an agreed statement of facts seeking a writ of mandamus to compel respondents to perform certain duties incumbent upon them under the provisions of Cleveland Ordinances Nos. 149-64 and 1921-64.

Relators in this action are the owners of record or the lessees of record under 99-year leases renewable forever of certain land units located in Re-use Parcel 11 of Erieview I Urban Renewal Project No. Ohio R-36.   Respondents are the city of Cleveland, its Mayor, and the Director of the Cleveland Department of Urban Renewal and Housing.

According to the original plan for the Erieview I Urban Renewal Project, a portion of relators' land was required to complete the site of the Federal Office Building now under construction on Re-use Parcel 11.   In a letter dated December 9, 1963, relators offered a proposal to the city of Cleveland, which in substance provided for a land exchange whereby the city would acquire from relators the land necessary for part of the site of the Federal Office Building and relators in return would acquire from the city other interests in land within that portion of Re-use Parcel 11 not required for the Federal Office Building.   Relators' intent in making this proposal was to acquire

land which, together with other land already owned by them, would be used by relators to construct a building complex in harmony with the overall Erieview Plan.

The letter proposal was received by the Mayor at a well-publicized meeting and at his direction was held open at his office for study by all interested persons for a period of thirty days. During this period, the respondent Director of the Department of Urban Renewal and Housing caused over seventy separate letters of notification of the proposal and solicitation of alternative bids to be sent to all members and members-elect of the City Council, the editors and general managers of the Cleveland news media, to all parties with whom the city had previously executed project agreements for development of Erieview I, prospective developers, various other agency and department heads, and to other interested persons. During this thirty-day period no alternative proposals were submitted or received by the respondent city nor were any requests received for an extension of time during which alternative proposals might be filed.

At the close of the thirty-day period negotiations between relators and respondents occurred during which relators made several important concessions to the city. These negotiations concluded with an offer by the city to exchange, as an equivalent for the land of relators necessary for the Federal Office Building, an area previously acquired by the city for urban redevelopment and known as land unit 8-11. However, several conditions were attached, including that in the event relators failed to produce a plan for redevelopment of the entire remainder of Re-use Parcel 11 satisfactory to the City Council within six months, such land was to be reconveyed to the city for the same price as had been originally paid by the city, and, subsequent thereto, all of relators' remaining lands were to be appropriated by the city in accordance with urban redevelopment procedures.

Thereupon, on January 21, 1964, an ordinance accepting relators' proposal, as modified, was introduced in the City Council. After review by three city departments and submission to public hearings, the ordinance (No. 149-64) was passed on February 17, 1964, and approved by the Mayor.

In compliance with the letter proposal and ordinance, relators completed within the six-month period the required

studies, surveys, and proposals, and prepared the required amendment to the Urban Renewal Plan for Erieview I. Relators proposed to build in this area a complex of commercial retail and luxury hotel facilities. At an open hearing on August 7, 1964, before the Cleveland City Planning Commission, arguments were submitted for and against the proposed plan.

On September 14, 1964, Cleveland Ordinance No. 1921-64 was introduced into council. This ordinance approved relators' proposal, designated this new area as Re-use Parcel 11A, and authorized the Mayor to enter into a project agreement with the relators and to convey to relators the balance of land in Re-use Parcel 11A "* * * at a price as determined by the Board of Control of the city of Cleveland to be the fair re-use value of said land determined by re-use appraisals and approved by the Housing and Home Finance Agency of the United States Government."

After referral to three separate committees, the ordinance was recommended for passage. However, the council returned the ordinance for further review. After the second hearing by the individual committees, a rehearing by the combined committees, and three readings before the council, this ordinance authorizing the relators' proposal was passed on October 12, 1964.

As a prerequisite to relators obtaining of the necessary financing from the Housing and Home Financing Agency of the United States, respondents are required to take certain steps as prescribed by Chapter 2 of the Urban Renewal Manual. These duties include respondents (1) ordering re-use appraisals for the balance of the land within Re-use Parcel 11A and (2) requesting the preparation of a project agreement specifying the final terms and conditions under which relators are to be authorized and directed to proceed with the acquisition and redevelopment of the balance of the land in Re-use Parcel 11A. By Cleveland Ordinance No. 1921-64, respondents have been directed to perform these acts.

On June 28, 1965, relators made a written demand upon respondents to perform these required duties. On June 30, 1965, respondents refused to perform and have thenceforth refused to have any dealings whatsoever with relators. Conse-

quently, relators have petitioned this court for a writ of mandamus compelling performance by respondents.

In their brief, respondents allege the following as a basis for their refusal to perform:

1. The Charter and Ordinance provisions of the city of Cleveland require competitive bidding with respect to the resale to a private redeveloper of property acquired by the city in furtherance of an urban renewal project.

2. The required competitive bidding procedures under the charter and ordinances were not complied with by the procedures in the present fact situation.

The instant case is a problem of first impression to this court and, to our knowledge, the courts of Ohio. Numerous cases touch on the subject, but none has squarely decided all the relevant issues.

Sections 1.4402 and 1.4405 (effective December 17, 1958) of the Codified Ordinances of the city of Cleveland, in substance, provide that the Commissioner of Purchases and Supplies shall advertise for bids relating to the sale of real estate in the same manner as other purchases and sales. Respondents, therefore, contend that these sections require competitive bidding in sales of urban redevelopment land and that Ordinances Nos. 149-64 and 1921-64 are in conflict therewith. However, the problem is quickly disposed of by mere reference to the provisions of the challenged ordinances themselves.

Cleveland Ordinance No. 149-64 (passed February 17, 1964) specifically provides:

"*Section 3.* That notwithstanding and as an exception to Sections 1.4402 and 1.4405 of the Codified Ordinances of the city of Cleveland, and in consideration of the conveyance of the foregoing described parcels of land in Section 2 hereof to the city of Cleveland, the Mayor be and he is hereby authorized and directed to execute and deliver an official deed of the city of Cleveland * * * conveying to the grantors [relators herein] * * * the following described premises located within the city of Cleveland: * * *"

Ordinance No. 1921-64, Section 2, specifically provides:

"*Section 2.* That in furtherance of the legislative intent previously expressed by the Council of the city of Cleveland in

the adoption of Ordinance No. 149-64 on February 17, 1964, the Mayor of the city of Cleveland be and he is hereby authorized and directed to enter into a Project Agreement with * * * [relators]."

The applicable rules of statutory (ordinance) construction are well known. In 50 Ohio Jurisprudence 2d 82-88, Statutes, Sections 102, 104 and 106, the applicable rules are stated as follows:

Section 102. "As a general rule a special law repeals an earlier general law to the extent of any irreconcilable conflict between their provisions, or, speaking more accurately, it operates to engraft on the general statute an exception to the extent of the conflict. In other words, where the general provisions of a statute are found to be in conflict wtih the express provisions of a later act relating to a particular subject, the latter will govern, although the words of the earlier general act standing alone would be broad enough to include the subject to which the more particular provisions relate. * * *"

Section 104. "The policy against implied repeals has peculiar and special force when the conflicting provisions, which are thought to work a repeal, are contained in a special act and later in a general act. * * * Indeed, the presumption is that the special statute is intended to remain in force as an exception to the general act. The general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment. The special provision has been declared to modify, qualify, limit, restrict, exclude, supersede, control, govern, and prevail over the general provision, although the words of the general act, standing alone, would be broad enough to include the subject to which the more particular provisions relate. Thus, as a general rule, general statutory provisions do not control or interfere with specific provisions, but must yield thereto."

Section 106. "The rules, enunciated in the previous section, relating to the control of special statutory provisions over general ones are particularly applicable where the special provision is a later enactment, * * *."

In view of the expressions of legislative intent of the Cleveland City Council, which have been expressly built into the challenged ordinances by the council itself, plus the rules of statu-

tory construction referred to above, this court holds that the general provisions of the Codified Ordinances of Cleveland, Sections 1.4402 and 1.4405, must yield to and are validly controlled by the specific enactments contained in the more recent but challenged ordinances.

Granted the nonapplicability of the earlier general ordinances relative to required competitive bidding, a much more difficult problem is presented by the allegation that the exchange in question does not comply with the provisions of the city charter. Sections 101 and 102 of the Charter of the city of Cleveland provide as follows:

"*Section 101. Division of Purchases and Supplies.* There shall be in the Department of Finance a Division of Purchases and Supplies. The Commissioner of Purchases and Supplies shall make all purchases for the city in the manner provided by ordinance, and shall, under such regulations as may be provided by ordinance and by direction of the board of control, sell all property, real and personal, of the city not needed for public use or that may have become unsuitable for use or that may have been condemned as useless by the director of a department. * * *"

"*Section 102. Governing Regulations.* Before making any purchase or sale, the Commissioner of Purchases and Supplies shall give opportunity for competition, under such rules and regulations as the council shall establish.
"* * *"

Respondents contend that these two charter sections must be read in *pari materia* and that in essence they provide that the Commissioner of Purchases and Supplies shall, under such regulations as may be provided by ordinance and by direction of the Board of Control, sell all real and personal property not needed for public use. Furthermore, it is contended that before making any such sale of property no longer needed for the public use, the commissioner shall give opportunity for competition under such rules and regulations as the council shall provide.

Assuming, *arguendo,* the correctness of this contention, full cognizance remains to be taken of the interrelationship of these charter provisions with the theory of eminent domain proceedings and its application to urban redevelopment projects.

It is now generally accepted that private property may not be taken except for a public use or, as the rule is also phrased, for a public purpose or public welfare. However, in United States legal history, the concept of "public use" in eminent domain proceedings has followed a tortured and twisted course and, as a result, two alternative theories and various shadings thereof have developed to implement the general test for public use. See, generally, Note, *What is Public Use in Eminent Domain*, 4 St. Louis University Law Journal (1957), 316; Mandelker, *Public Purpose in Urban Redevelopment*, 28 Tulane Law Review (1953), 96; Note, *Public Use Under Eminent Domain*, 15 South Carolina Law Quarterly (1962), 943, at 965; Note, *What Constitutes a Public Use?*, 23 Albany Law Review (1959), 386; Annotation, 54 A. L. R. (1928), 7.

Under one rule, an "actual use" by the public is required. To the courts adopting the other rule, a "beneficial use" to the public is sufficient. When the constitutionality of the various urban redevelopment plans was challenged, the courts, irrespective of the theory which they had previously followed, generally upheld the validity of these plans. For example, *Nashville Housing Auth. v. City of Nashville* (1951), 192 Tenn. 103, 237 S. W. 2d 946; *Foeller v. Housing Auth. of Portland* (1953), 198 Ore. 205, 233-235, 256 P. 2d 752. Furthermore, the resale of urban redevelopment lands to private redevelopers has also been upheld under both rules. However, in the cases relying on the "beneficial use" theory, the courts have held that elimination of blight was the controlling purpose and, although there was a possibility of resale or lease of the land to private persons, this was still a part of the public use, and, therefore, should be disregarded as incidental. See *Opinion of the Justices* (1950), 254 Ala. 343, 48 So. 2d 757; *Chicago Land Clearance Comm. v. White* (1952), 411 Ill. 310, 104 N. E. 2d 236; *In re Slum Clearance* (1951), 331 Mich. 714, 50 N. W. 2d 340; *Belovsky v. Redevelopment Authority of Philadelphia* (1947), 357 Pa. 329, 54 A. 2d 277; *Ajootian v. Providence Redevelopment Agency of City of Providence* (1952), 80 R. I. 73, 91 A. 2d 21.

On the other hand, in cases relying upon the "actual use" theory, primary emphasis is placed on the fact that the area in question was to be acquired by the public and used by it for the clearance of blight and the preparation of the area for rede-

velopment. Sale of the land to private redevelopers after clearance was deemed proper in these cases, because the public should not retain title to land for which it no longer has any use. See *Foeller* v. *Housing Auth. of Portland*, 198 Ore. 205, 256 P. 2d 752.

It is readily apparent that an element of the "beneficial use" theory in urban redevelopment cases is the proposition that the public use is essentially a continuing one and that the public benefit continues during the redevelopment of the blighted area.

In *Gohld Realty Co.* v. *City of Hartford* (1954), 141 Conn. 135, 143, 104 A. 2d 365, the Supreme Court of Errors stated, at page 143:

"* * * If the public use which justifies the exercise of eminent domain in the first instance is the use of the property for purposes other than slums, the same public use *continues* after the property is transferred to private persons. The public purposes for which the land was taken are still being accomplished. * * *" (Emphasis added.)

See, also, *Belovsky* v. *Redevelopment Authority of Philadelphia*, 357 Pa. 329, 54 A. 2d 277, at 340.

Conversely, the "actual use" theory favors the ending of public use as soon as the land is cleared and prepared for redevelopment. Consequently, before any cases may be cited as applicable to the question in the instant case, clear understanding of these alternative theories is mandatory.

The Charter of the city of Cleveland (Section 101) provides that "The Commissioner of Purchases and Supplies shall * * * sell all property, real and personal, * * * not needed for public use * * *." It is obvious that whichever theory is found to be the Ohio rule will determine the outcome of this case.

The Supreme Court of Ohio has unequivocally stated its position regarding the applicable rule in public use cases. Section 19, Article I, Ohio Constitution, is the basis for all eminent domain proceedings. This section provides that "Property shall ever be held inviolate, but subservient to the public welfare." In *State, ex rel. Bruestle, City Solicitor*, v. *Rich, Mayor* (1953), 159 Ohio St. 13, the "actual use" theory was advanced as a basis for invalidating an urban redevelopment project in

Cincinnati. The court rejected this narrow argument and stated, at page 24, that "In our opinion, to give * * * [Section 19, Article I] the restricted meaning, which respondents * * * advocate, would be to amend the section by judicial action."

Respondents in the instant case have attempted to utilize the language appearing in the third paragraph of the syllabus in *Pontiac Improvement Co.* v. *Board of Commissioners* (1922), 104 Ohio St. 447, which appears to support the "actual use" theory. However, in *State, ex rel. Bruestle, City Solicitor,* v. *Rich, Mayor,* 159 Ohio St. 13, the court expressly limited this statement contained in *Pontiac* and stated, at page 26, that this language "* * * appears to be contrary to the intentions expressed by the people by the words used in Section 19 of Article I of the Constitution and inconsistent with other pronouncements of this court."

Furthermore, prior case law in Ohio is consistent with the "beneficial use" approach and is inconsistent with the theory advocated by respondents. See, for example, *Sessions* v. *Crun-Kilton, Treas.* (1870), 20 Ohio St. 349, 356; *State, ex rel. Shafer,* v. *Otter* (1922), 106 Ohio St. 415, 432; *Shaver* v. *Starrett* (1855), 4 Ohio St. 494, 499.

In urban redevelopment cases, the public use does not end when the land is merely cleared, because original and subsequent regulation of the nature of the subsequent use is crucial if the redeveloped area is to be continuously preserved from a recurrence of blight. The *long term* public use and benefit of urban renewal is derived from a program providing for clearance, reconstruction and regulation of subsequent use. That this is the philosophy of the Ohio courts is well illustrated by the case upholding the validity of the Erieview development—*Grisanti* v. *City of Cleveland* (1962), 89 Ohio Law Abs. 1. In that case, Judge Hurd, writing for a unanimous court, stated, at page 15:

"* * * the acquisition by the city of all of the various properties and the titles thereto is only a means to an end. The objective is the elimination of the blighted areas and the subsequent reconveyance of part or all of said land to the redeveloper or redevelopers with exclusive restrictions on the use of the land to prevent recurrence of blight. * * *"

In urban redevelopment cases, public use could only end if

there were no regulation regarding subsequent use and development of the cleared land. Without regulation of subsequent use, however, the long term result could then only be conjectural, and this conjectural result could in turn be an argument for invalidating the original condemnation as not being for a public use. Cf. *State, ex rel. Sun Oil Co.,* v. *City of Euclid* (1955), 164 Ohio St. 265. The public use inherent in the concept of urban redevelopment must be interpreted as a continuing one, unless we are to believe that the public is greatly benefited by temporarily vacant lands in downtown areas, useful only as interim parking lots.

Under this analysis, it is apparent that Sections 101 and 102 of the Charter of the city of Cleveland dealing with competitive bidding for land no longer needed for public use are inapplicable. The charter, by its very wording, forbids such an interpretation.

This conclusion is supported by a recent highly analogous Ohio decision which considered the problem of the application of the Charter provisions of the city of Dayton (virtually identical to the Cleveland Charter provisions) to the problems of urban renewal and competitive bidding. In *Eikenbary* v. *City of Dayton* (1964), 3 Ohio App. 2d 295, the Court of Appeals for Montgomery County stated, at page 307:

"We do not consider these sections of the charter applicable to the sale of land taken by the city for the purpose of urban renewal. * * * [This section] applies to property 'not needed or unsuitable for public use.' Land taken by the city for the purposes of urban renewal is taken for a public use. * * *"

As a result of the above line of cases, we determine and therefore hold that the land involved in the instant case has been acquired for the public use and its resale to private redevelopers under regulations as to use is a part of the continuing public benefit.

Urban renewal programs are a recent development in comprehensive city planning. These programs—adopted in 45 states and the District of Columbia—have introduced a whole new concept into metropolitan life and are rapidly changing the face of American cities. Large scale urban renewal has only been possible since the enactment of the federal Housing Act of 1949, Section 1441, Title 42, U. S. Code (63 Stats. at L.

413). Prior to that time, cities had enacted zoning regulations and other such measures, but urban renewal as we know it was impossible for a variety of financial and other reasons.

The Charter of the city of Cleveland was originally adopted in November 1915. It was amended in its entirety in 1921 and again in 1931. At the time of its last revision, urban renewal was virtually unknown, and it was almost two decades after this last revision when large scale urban renewal became feasible. To attempt to force new stampings into old dies must of necessity cause friction, and frank recognition of the problem is essential.

In *Eikenbary* v. *City of Dayton*, 3 Ohio App. 2d 295, the Court of Appeals, when dealing with a similar problem, stated, at page 310:

"The redevelopment of the area in question is an undertaking of great magnitude and complexity. While the city is offering to sell land for redevelopment, it is at the same time offering to buy a plan for such redevelopment. The plans sought will require much ingenuity and know-how and entail some element of risk. Because the city is buying the skill of a proposed redeveloper, it need not be as precise in its specifications as when buying a fire truck. * * *"

The court then went on to hold that the competitive bidding provisions of the Dayton Charter were inapplicable to urban redevelopment.

Judicial decisions that charter provisions specifying competitive bidding are inapplicable are nothing extraordinary in Ohio law. For example, a contract to manage the Cleveland Zoo, a contract for advertising services in the Cleveland Transit System, and a contract for title services, have all been held not to be within the competitive bidding provisions of the charter. See *City of Cleveland* v. *Lausche, Mayor* (1943), 71 Ohio App. 273; *Hordin* v. *City of Cleveland* (1945), 77 Ohio App. 491; *State, ex rel. Doria,* v. *Ferguson, Aud.* (1945), 145 Ohio St. 12.

The purpose of the competitive bidding provisions in the charter is to insure that the most advantageous terms possible are secured for the city of Cleveland, its residents and taxpayers. Casual reference to the facts of this case disclose the extremes to which the city of Cleveland has gone in order to

obtain the best possible terms. Of great importance are the thirty-day waiting period established by the Mayor, the announcement and solicitation of alternative bids by the Director of Urban Renewal and Housing, the extensive public and council committee hearings on each phase of the negotiations, the lack of alternative bidders for redevelopment of this area, the provisions for forfeiture if relators failed to produce the necessary plans, the required approval of resale price both by the Board of Control and by the Housing and Home Financing Agency of the United States, and the extensive preparations required of the relators before the acceptance by the council of their proposals. Other provisions protective of the public interest may be cited, but it is already obvious that this interest has been amply protected by the procedures followed herein.

Respondents further contend that Ordinance No. 1921-64 is void and of no effect in that it improperly delegates to the Board of Control of the city of Cleveland the duty of fixing the purchase price to be paid for the property which the Mayor, by that ordinance, is authorized and directed to convey to the relators. However, we find no merit whatsoever to this contention and, therefore, are unable to accept respondents' theory in this matter.

If Sections 101 and 102 of the Cleveland Charter are inapplicable to the instant case, then recourse must be made to Section 1 of the Charter of the city of Cleveland. This section provides:

"* * * The city shall have all powers that now are * * * granted to municipalities * * * and all such powers whether expressed or implied shall be exercised and enforced in the manner prescribed in this charter, or when not prescribed herein, in such manner as shall be provided by ordinance or resolution of the council."

Under this provision, the method of disposal of urban renewal land is left to the Council of the city of Cleveland. *Eikenbary* v. *City of Dayton*, 3 Ohio App. 2d 295. The council by specific legislation (Ordinances Nos. 149-64 and 1921-64) has validly specified, and with exactitude, the procedure to be followed in connection with the acquisition and sale of urban renewal land within Re-use Parcel 11A. We determine, and therefore hold, that under the facts of the instant case neither

the ordinances nor the Charter of the city of Cleveland were violated in any manner.

Therefore, a writ of mandamus is allowed commanding respondents to order the necessary re-use appraisals with respect to the balance of land within Re-use Parcel 11A and to request the preparation of a project agreement as they have been directed to do by the ordinances of the city of Cleveland.

*Writ allowed.*

ARTL and CORRIGAN, JJ., concur.