**CY ELLIS RAW BAR, a partnership, Appellant,**

v.

**DISTRICT OF COLUMBIA REDEVEL-OPMENT LAND AGENCY, a body corporate, et al.**

**No. 23302.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 24, 1970.

Decided Aug. 27, 1970.

Petition for Rehearing Denied Nov. 5, 1970.

Mr. Donald Dent Webster, Washington, D. C., for appellant.

Mr. Warren R. King, Asst. U. S. Atty., wih whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry, Joseph M. Hannon, and Nathan Dodell, Asst. U. S. Attys., were on the brief, for appellee District of Columbia Redevelopment Land Agency.

Messrs. Thomas S. Jackson and Arthur C. Elgin, Jr., Washington, D. C., were on the brief for appellee Waterfront Enterprises, Inc.

Messrs. Norman M. Glasgow, George H. Clark, and Whayne S. Quin, Washington, D. C., were on the brief for appellees Josph L. Cannon et al.

Before TAMM, LEVENTHAL, and WILKEY, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case arises from a frustration for the past ten years of an attempt by Congress, as one aspect of the program of urban renewal within the District of Columbia, administered by the D.C. Redevelopment Land Agency (hereinafter RLA), to provide priority to those displaced from an area by the call of progress to relocate within the area after it has been renewed.

Appellant formerly owned a restaurant on the waterfront in the southwestern section of Washington, an area of urban redevelopment and business relocation. She brought this action to restrain RLA from "taking any action which might further violate plaintiff's statutory rights to a priority"—the priority of a "displaced business concern"—to lease waterfront property available after the redevelopment. Her appeal is from the denial of a preliminary injunction. We hold she is entitled to injunctive relief as delineated hereafter.

## I. BACKGROUND

We begin consideration of the appeal by sketching the history of the legislation controlling the relocation, the setting for the particular controversy here involved, and the rather complicated course of this case through the District Court thus far.

### A. The Pertinent Legislation

Development of urban renewal plans for the Washington Channel waterfront in Southwest Washington dates from the original commitment in 1954 of the waterfront area to the Webb & Knapp Co. which later defaulted in performance. The National Capital Planning Commission and the District of Columbia Commissioners finally approved a new plan for the waterfront. The execution of the plan was entrusted to the RLA. One aspect of the plan was the construction of new roads, including the Southwest Expressway, and the relocation of businesses displaced by highway construction. On September 8, 1960, a bill was passed which provided for, among other matters, a business relocation plan. Title to waterfront property was placed in the RLA. The law provided:

When the real property affected by the provisions of this subsection becomes available for leasing by the Agency [RLA], the Agency shall notify, in writing, the owners of the business concerns displaced by reason of the operation of [72 Stat. 983], as to the availability of such real property for leasing to such owners in accordance with the provisions of this subsection. The Agency shall give such owners so notified a period of one hundred and eighty days to notify the Agency, in writing, of their intention to proceed in accordance with the general development plan of the Agency * * * and to demonstrate to the

Agency their ability to carry out so much of such plan as may be embraced within the area which they desire to lease. If at the end of such period of one hundred and eighty days, such owners have failed to make a demonstration to that effect which is satisfactory to the Agency, the priority of opportunity provided by this subsection shall no longer continue to be available to such owners. [74 Stat. 872.]

By early 1963 nothing had yet been accomplished toward the relocation of the businessmen who had been displaced. Various proprietors of affected small businesses complained about the plan in committee hearings held in early 1963, but no action was forthcoming from the RLA until February 1964 when the RLA finally issued the notices called for in the statute. There followed what can only be called a fiasco. Without stopping to set forth the gory details, it suffices to say that the terms of the leases as offered by RLA presented the small business men with "an economic impossibility" in the words of the House Committee on the District of Columbia.[1]

At the end of the 180-day period no specific offers for parcels of property had been made to the displacees, a word that seems to have become a term of art for the displaced businessmen. Expert testimony at subsequent hearings established that the proposals of the RLA were totally unsuitable for bank financing—an obvious necessity for most businessmen whose businesses had been lost in 1960. New legislation was passed in 1967, incorporating the statutory language which governs this case and adding language to prevent certain abuses by the RLA. The House Committee commented:[2]

Approximately 8 years have passed since the D.C. Redevelopment Land Agency pledged to the Congress that the small businesses on the waterfront would be permanently relocated in the course of redevelopment of the Washington Channel Waterfront. None of the businesses has been permanently relocated, and in fact no economically feasible offer of relocation on any specific site has been tendered to any of the displaced businesses under the specific priorities provided by Act of Congress. The Agency has failed to meet its repeated commitments to your Committee and to the Congress.

### B. The Origins of the Present Controversy

In June 1968 the RLA moved again to open a statutorily prescribed 180-day period. Notices were sent to displacees including the appellant, Mrs. Ellis. Included with the letter of notice was a Prospectus which outlined the procedure to be followed by those seeking to take advantage of their priority. The procedure required the displacees to present lease offers to the RLA, and it also established a bifurcated priority system: offers submitted within the first 90 days would be given priority over those submitted in the second 90-day period. Mrs. Ellis met a few times with RLA officials within the first 90-day period, but nothing concrete resulted. On September 24 the displacees were notified that Hogate's, another restaurant-displacee, had made an offer on a certain parcel of land and that a public hearing would be held on October 2, 1968, on the RLA's proposal to accept the offer. On October 1, Mrs. Ellis delivered a letter to the RLA protesting its procedure in the relocation program and serving notice of her intent to apply for space in a site not requested by Hogate's. She attended the October 2 meeting but did not speak and was not asked to do so. Within a week, on October 9, the Board of Directors awarded to Hogate's the space it had sought, though a lease was not entered until June 30 of 1969, the following year, for reasons which will appear in our discussion of the litigation.

1. H.R.Rep. No. 115, 90th Cong., 1st Sess. 4 (1967).

2. Id., at p. 7.

In late November 1968, Mrs. Ellis retained counsel for the first time. At approximately the same time she received a letter from the RLA warning her that her priority rights would terminate on December 4, 1968 (the end of the 180-day period), if she did not submit an offer by that time. On December 2, Mrs. Ellis presented the RLA with a lengthy letter stating her belief that the procedure outlined in the Prospectus violated the statutory scheme and denied her her rights under the statute. The letter was not answered in writing, but Mrs. Ellis was informed orally by the General Counsel for the RLA that her protests and requests had been considered and denied. She brought suit on December 13, 1968, nine days after her priorities allegedly lapsed.

### C. The Litigation in the District Court

Several District Judges participated in this case because, at the time it was brought, the District Court was operating under the so called master calendar system and had not yet adopted its individual calendar system under which one judge is assigned to a case for all purposes. The first District Judge heard oral argument on January 3, 1969, on Mrs. Ellis's complaint and on her motion for a temporary injunction, the denial of which is the subject of this appeal. He attempted to get the parties to settle, hinting that the RLA would be unhappy with his ruling if it did not settle. The parties agreed to attempt a settlement. Specifically, Mrs. Ellis agreed to make the RLA an offer. In the meanwhile the RLA agreed to suspend operations, including the signing of Hogate's lease. Other restaurant owners who had exercised their right to submit offers intervened at this time. On March 12, Mrs. Ellis submitted an offer to the RLA, pursuant to the settlement attempt, while preserving all of her rights under the statute. On March 26, the RLA rejected the offer, stating

that Mrs. Ellis had requested more space than she was entitled to.[3] On April 8, the RLA filed a supplemental opposition to Mrs. Ellis' action, arguing in effect, that even if the statute hadn't been complied with earlier, her offer and the RLA's rejection of it, pursuant to the settlement attempt, satisfied the statutory requirements and that consequently she no longer had a right to complain. The same day Mrs. Ellis' attorney warned that he would move to strike the supplemental defense because it relied on a settlement attempt, and set forth her willingness to reduce her space request and to try to conform to RLA requirements in other ways.

The pending matters were reargued before a second District Judge on April 15, at which time Hogate's was granted leave to intervene. On May 14, the second judge filed findings and denied Mrs. Ellis a preliminary injunction. That is the order now appealed to this court.

Meanwhile, Mrs. Ellis moved to amend her original complaint to include an attack on the 90-day superpriority and on Hogate's right to inclusion in the group granted priority under the statute. Consideration of that motion was assigned to a third District Judge. Before he ruled, however, a fourth District Judge heard argument on Mrs. Ellis' motion to strike RLA's supplemental defense, which referred to the post-settlement offer, and granted that motion on June 6. On June 13, the third District Judge denied Mrs. Ellis' motion to amend her complaint and her motion, made that day, for an injunction pending appeal.

## II. THE ISSUES ON THE MERITS

The recital of background foreglimpses some of the difficult questions presented in this case. One issue is whether, as Mrs. Ellis contends, the statute requires the RLA to make an offer to the displacee rather than vice versa. Another issue is presented by RLA's contention

---

3. The statute called for facilities "substantially equal" to those enjoyed before the relocation. 74 Stat. 872.

that Mrs. Ellis nonetheless lost her priority rights by not complying with the statutory requirement of demonstrating during the 180-day period her ability to carry out the RLA plan involved in the parcel she wanted. The legality of the 90-day superpriority has also been put in issue as has the question of whether irreparable harm is threatened either to plaintiff, from denial of the injunction, or to defendant RLA, from granting it. The possibility was raised at oral argument that the present posture of the case would allow determination not only of the propriety of a preliminary injunction but also of the propriety of a permanent injunction. Before we reach any of these issues, however, a few cobwebs should be swept away.

■ First, the RLA argues that according to traditional rules of administrative law, its interpretation of the statute should be given deference by the Court because it is the agency entrusted with administration of the statute. We think that our discussion in part I, A *supra* should be enough to establish that no presumption of expertise, either in interpreting or applying the statute, could appropriately be given the RLA. We need not rely for that conclusion on our own estimate of the RLA's past performance, for, as we have shown, the legislature itself has responded to RLA's past interpretation and administration of the legislation with severe censure. The general presumption that the agency has correctly discerned and implemented the intent of the legislature, would seem singularly inappropriate.

■ Second, the number of litigants, including intervenors, and the contentions concerning irreparable harm, discussed later in this opinion, may tend to obscure the heart of the relief asked for in this case. Mrs. Ellis did not ask that others be denied the property already leased to them; her petition asked for an order "restraining defendant from taking any action which might further violate plaintiff's statutory rights to a priority of opportunity. * * * " It is within the capacity of the equity court to fashion relief that serves the interests of some parties without infringing upon the interests of others.

## A. Who Must Make the Lease Offer

■ We turn to appellant's contention that the statute contemplates that the agency will make the lease offer to the displacee, not vice versa. The statute, quoted in part I, contains no specific reference to this point, and ordinarily this gap of silence could be filled in by the exercise of discretion of the RLA as administrator of the statute. But reports accompanying the legislation at two widely separated points in its history do refer to the RLA as making the offer. Thus in the 1960 House Committee Report [4] there is reference to "an opportunity * * * to accept or reject the offer made *by the Agency* with respect to any piece of property in such area" (emphasis added). The 1967 House Report criticizes the RLA because at one point in the first (1964) attempt to make leases available, "the priority holders had not been offered any specific parcels for relocation." [5] Moreover, Mrs. Ellis makes a persuasive argument that Congress must have intended offers to come from the RLA, rather than from the displacees, since proposals to the RLA are not "bankable," i. e., adequate as a basis for a bank loan, while the offer of a lease to the displacee is. Certainly in a scheme to promote the relocation of businesses, especially businesses which Congress recognized to be for the most part "small businesses", [6] it would be unrealistic to

4. H.R.Rep. No. 2081, 86th Cong., 2d Sess. 4 (1960).

5. H.R.Rep. 115, *supra* note 1, at p. 4.

6. See *Id.*, at p. 7, in excerpt to note 2 above.

assume that Congress did not want to make financing realistically available. A different problem which arose in the 1964 attempt to make leases available was criticized in part in the 1967 House Report because it made financing by banks "wholly unsuitable." [7] We conclude that Congress intended that the lease offers should be made by RLA, and that when this defect is noted on timely objection by a displaced person, RLA's omission must be held invalid.

### B. Plaintiff's Failure to Demonstrate Her Ability to Carry Out the RLA Plan

■ However, the statute still requires of the displacee that he demonstrate to the RLA his ability to carry out the RLA's plan, as it relates to a specific parcel, before RLA is required to make an offer. Mrs. Ellis did not do so within the 180-day period. The question arises whether the RLA's faulty procedure with respect to making offers relieved Mrs. Ellis of the obligation of complying with the statutory requirement of making a showing of ability. Though the question is not free from doubt, we conclude that Mrs. Ellis was not required to fulfill that requirement in the circumstances here presented, that is, while the RLA was demanding, contrary to the correct interpretation of the statute, that her showing be followed by an offer initiated by her to lease a certain parcel from it. The statutory requirement of a showing by Mrs. Ellis was to trigger the RLA's action in submitting a lease. We do not think the legislature · may be fairly supposed to have insisted that Mrs. Ellis compile a showing of her ability at a time when she was on notice that in any event the RLA would, wrongfully, refuse to make a specific offer. Her December 2 letter of protest, which came within the 180-day period, adequately served to put RLA on notice that its procedure was being questioned.

Obviously, Mrs. Ellis could not have sat on her rights indefinitely. But since her protest came before the end of the 180-day period established by the RLA, RLA cannot claim failure to satisfy its statutory obligation to her reflects either inducement by or reliance on her acts. Our ruling that Mrs. Ellis had standing to seek a location for herself does not mean her protest would have given her a standing to divest others who had previously obtained leases by cooperating fully with RLA. That is a separate question not presented in this case.

### C. Other Contentions Raised on Applications for Permanent Injunction

■ RLA contends that Mrs. Ellis is not confronted with the irreparable injury warranting an injunction pendente lite. We need not decide this question, as she plainly is confronted with the kind of irreparable injury that would warrant a permanent injunction if she is · correct as to the merits, and we became convinced at argument that the case is now in such a posture that the interest of justice would be furthered by disposition of the case on the basis of the application for permanent injunction. We asked for memoranda on this point. Mrs. Ellis agrees that the record is sufficient for final determination on the merits. Intervenor Waterfront Enterprises presented an objection to trial of certain matters on affidavit, but its position need not be pursued because its interest is only that its own lease should not be imperiled and appellant has conceded that its relief may be confined to according her opportunity to lease property not covered by any lease previously issued.

■ RLA says that the defenses in its answer warrant consideration on the merits. We have looked at those defenses and think it plain that they do not

---

7. *Id.*, at p. 5.

require a trial or taking of additional evidence. For the most part its defenses rest on legal contentions we have held unsound in the prior part of this opinion. RLA also claims that the matters complained of by appellant are committed to unreviewable agency discretion. We hold that what is involved is a violation of the statute that is subject to judicial review and correction.

■ Finally, RLA presents a contention that is not only unsound legally but represents a continuation in court of the kind of hostile and obstructive attitude that has been condemned by the legislative committee and has impelled our conclusion that it has been frustrating rather than effectuating the legislative mandate. Briefly RLA wishes to have appellant's action dismissed on the ground that the offer she submitted on March 13, 1969, has already received the application of the standards generally followed by RLA. We think the District Court was plainly right in striking this defense, and we find it regrettable that government counsel should persist in advocacy of such a claim. The matter involved was all pursuant to an effort of a District Judge to reach a compromise settlement, and nothing put forward by appellant in that regard can be turned against her in a disposition of the merits.

We remand to the District Court to fashion a remedy to plaintiff that will not jeopardize intervenor's lease or infringe on the leases of other displacees. Perhaps in the light of this direction, which we hope is clear-cut, it may be possible to arrive at the spirit of cooperation among RLA, the District Government, and the tenants, that the Congressional committee urged on all concerned. H.Rep.No.2525, 85th Cong., 2d Sess. p. 5 (1958). If the parties cannot work out an amicable settlement the District Court will fashion a decree not inconsistent with this opinion.

Reversed and remanded.