**John E. BATTISON, et al., Plaintiffs,**

**v.**

**CITY OF NILES, OHIO, et al., Defendants.**

**No. C 76–101 Y.**

United States District Court, N. D. Ohio, E. D.

Jan. 19, 1977.

---

**9.** See note 3 *supra.*

Jack M. Schulman, Cleveland, Ohio, for plaintiffs.

Thomas A. LaPolla, Warren, Ohio, Mitchell F. Shaker, Sol., City of Niles, Niles, Ohio, Frank H. Lord, Asst. U. S. Atty., Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION, ORDER, AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAMBROS, District Judge.

This is an action pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1455. Plaintiffs allege that they have been denied effective relocation assistance under the urban renewal project currently in progress in Niles, Ohio. This case came on for trial to the Court on July 6, 1976.

Prior to trial the Court considered and deferred ruling upon motions to dismiss presented by the respective defendants. Upon further consideration, the motions of the defendants are denied.[1]

## I. FINDINGS OF FACT

### (a) Background

The Neighborhood Development Program (NDP) of the City of Niles (Niles) was approved by the Department of Housing and Urban Development (HUD)[2] on July 11, 1971. The Niles Urban Redevelopment

---

1. See *Garrett v. City of Hamtramck*, 503 F.2d 1236 (6th Cir. 1974); *Gardner v. Nashville,*, 468 F.2d 480 (6th Cir. 1972); *Boles v. Greenville Housing Authority*, 468 F.2d 476 (6th Cir. 1972); *M. M. Crockin Co. v. Portsmouth Redevelopment & Housing Authority*, 437 F.2d 784 (4th Cir. 1971); *Home Furniture Co. of Charlotte v. U. S. Dept. of HUD*, 324 F.Supp. 1401 (D.N.C.1971); cf. *Gibson & Perin Co. v. Cincinnati*, 480 F.2d 936 (6th Cir. 1973); *FTC v.* *Feldman*, 532 F.2d 1092 (7th Cir. 1972); *Western Addition Community Organization v. Weaver*, 294 F.Supp. 433 (N.D.Cal.1968). The Court notes that the defendants City of Niles and Niles Community Development Agency have not presented any argument or authority in support of their motion.

2. Joint Exhibit 3, Items 1, 2, 3.

Agency (NURA) is responsible for the implementation of the NDP.[3]

Among the objectives to be accomplished by the NURA are:[4]

*Development Objectives*

The basic goal of the LPA for this NDP Area is to work closely with the occupants thereof in the development of a staged program for redevelopment, as herein provided, for the area and to transform a portion of the downtown retail and residential complex into an improved environment which will contain housing, governmental, retail, and cultural activities.

*Economic Objectives*

To increase and develop economic stability for the area. To encourage the revitalization and development of the commercial activities adjacent to residential areas as employment resources as well as neighborhood shopping.

*Design Objectives*

Overall design objectives have been established for the Urban Renewal Area to achieve sound and attractive development. They are as follows:

(a) Buildings shall be harmonious components of the overall site design. Provision of adequate open space and amenities shall result in an environment which supports sound residential and commercial areas conducive to pleasant living and working conditions.

(b) . . . Streets, walkways and open spaces shall form an overall site design together with the buildings, both existing and new.

(d) A landscaping plan shall be developed on the basis of obtaining a well integrated design, with focal points of interest.

*Program for Relocation*

The City of Niles will assist all families, individuals and business concerns to be displaced, to be relocated into accommodations which are decent, safe, and sanitary, and which are within their financial means.

Adequate accommodations for such displacees are either presently available or will be available during the NDP program.[5]

The final decision as to the acquisition and development of NDP parcels rests with the Niles city council. Council is assisted in its decisions by various committees of the NURA[6] and by the city administration. Council is further assisted by Gene Bray (Bray), Niles city planner and administrative/planning consultant to the NURA.

Plaintiffs are the owners of the Spot Restaurant (Spot), a sole proprietorship. The Spot is located within the NDP area at 13 E. Park Avenue.[7] Plaintiffs' business operates under a liquor license issued by the Department of Liquor Control of the State of Ohio which permits the sale of alcoholic beverages until 1:00 a. m. for on and off premise consumption. Pursuant to the regulations of the Department of Liquor Control, this license is valid only within the corporate limits of the city for which it has been issued. The license cannot be transferred without the consent of the Department of Liquor Control.

By Bray's letter of December 7, 1973 the plaintiffs were notified that Niles planned to acquire the property located at 13 E. Park Avenue as part of the NDP. Plaintiffs were further informed in this letter of the availability of relocation assistance.

---

**3.** The NDP land disposition map is set forth in the appendix to this opinion. The general downtown area of Niles is to the west of the NDP area. See, testimony of Harlan Evans.

**4.** Joint Exhibit 3, Item 1.

**5.** The relocation program is a pre-condition to the offering of an NDP program:

No contract shall be offered by the government unless and until the Local Public Agency provides satisfactory evidence of compliance with Sections 210 and 305 of The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970. Joint Exhibit 3, Item 1.

**6.** eg. Urban Design Committee; Community Development Committee.

**7.** The Spot is the sole tenant in the building situated at 13 E. Park Avenue.

In evaluating relocation sites, plaintiffs' principal concerns were to obtain adequate physical facilities in a location to which their liquor license would transfer, and which would allow them to preserve their customers.

The Spot's building is approximately 21 feet by 60 feet with a full basement. The restaurant facilities consists of a bar, lunch counter, booths, tables and kitchen. The basement is used to maintain cooling equipment and for storage. The building provides approximately 2500 square feet of space. Ideal relocation facilities would be a building 40 feet by 80 feet with a one-half basement. At a minimum, relocation facilities must provide approximately the same square footage of space that the Spot presently occupies.

The Spot is open Monday through Saturday from 5:30 a. m. to 1:00 a. m. The food trade is heaviest at the breakfast and lunch period, while the liquor trade is heaviest from 3:00 p. m. to 5:00 p. m. Plaintiffs' customers consist of downtown office workers, businessmen and professionals, and local industry workers. Ninety-five percent of the Spot's business is of a walk-in nature. Accordingly, appropriate relocation sites must have immediate access to downtown Niles.

Plaintiffs pay a monthly rental for the Spot of $175.00 plus utilities and maintenance.[8] In order to successfully relocate as tenants, plaintiffs must be able to lease suitable facilities at a cost factor of under $400.00 per month. In order to relocate through redevelopment, plaintiffs must purchase an NDP parcel and build their own facilities. This would involve a cost factor to plaintiffs of between $900.00 to $1200.00 per month. Therefore, to successfully relocate through redevelopment plaintiffs must be able to generate additional business to offset the increased cost.

### (b) Relocation Assistance—I

Relocation assistance to individuals displaced by the Niles NDP is provided through the office of the relocation director. The relocation director, in turn, is assisted by the regional office of HUD.[9]

Plaintiffs were primarily assisted in their efforts to relocate by Robert Henderson, relocation director.[10] Through their individual efforts[11] and the efforts of Henderson[12] plaintiffs became aware of, considered and rejected various possible relocation sites.[13] In considering these sites plaintiffs labored under the misconception that they could not relocate the Spot within 500 feet of a church or a public institution. This misconception emanated from the office of the building inspector, Rudolph Caldrone, and was reinforced by other officials of the NURA.[14] However, on May 1, 1975 plaintiffs submitted a site plan, elevation[15] and certified check for the purchase of parcel 4c in the NDP area.

### (c) Parcel 4c

The normal disposition procedure of NDP parcels begins in the office of the city planner. Upon determining that a parcel is ready for sale, the city planner requests the chairman of the NDP to set a date for public hearing regarding the disposition of such parcel. At the public hearing, proposals for the parcel in question are submitted to council. Council, in turn, refers the proposal to the urban design committee.[16]

---

8. The City of Niles, upon acquiring the building in which the Spot is located, reduced plaintiffs rent to $125.00 per month. See Joint Exhibit 3, Items 18, 19.

9. See eg. Joint Exhibit 3, Items 11, 12, 14, 25, 26, 42, 45.

10. Henderson served as the Niles relocation director until December 21, 1975.

11. See, testimony of Louis Battison.

12. See eg., testimony of Robert Henderson; Joint Exhibit 3, Item 20.

13. See, Joint Exhibit 3, Item 20.

14. See, testimony of Lois Battison; testimony of Robert Henderson; Joint Exhibit 3, Item 44.

15. Drawings that depict proposed buildings.

16. The urban design committee is comprised of laymen, city officials, and NURA officials.

Upon being approved by the design committee, the proposal is returned to council for final consideration.

A public hearing regarding the disposition of parcel 4c was held on June 4, 1975. Plaintiffs appeared before council at this meeting and were the only developers to submit a proposal for parcel 4c. Plaintiffs' plans, which were presented by their architect, Joseph Bush, were for a steel fabricated building with a stone exterior around the main entrance and windows, and a mansard roof. The plans complied with applicable building and zoning codes, and development costs were calculated as being between $65,000 and $70,000 exclusive of land and site improvements. The restaurant facilities were capable of servicing over one hundred people at one time, and included a private conference room to accommodate business luncheons.

Following plaintiffs presentation there was a heated discussion between the members of council, plaintiffs, Bush and others present regarding the nature of a steel structure as opposed to a comparable brick building. Plaintiffs were adamant in their desire to erect a steel building, while council clearly preferred a brick structure. At the conclusion of this discussion, council referred plaintiffs' proposal to the urban design committee for an evaluation of the aesthetic appeal of the proposed steel structure. The sole concern expressed by council was directed at the design of plaintiffs' building.

The design committee met on June 12, 1975. Initially, the committee discussed operational policies. During this discussion it was agreed that a position had not been taken against the use of steel in NDP structures. Bush then presented plaintiffs' proposal. The committee requested revisions as to the substitution of brick for stone, increasing the amount of brick paneling,

adding a screenwall to the rear of the structure, ingress and egress, color coordination and lighting. The committee then approved plaintiffs' proposal subject to compliance with these requests.

Council considered plaintiffs' proposal at its regular meeting of June 18, 1975. Prior to this meeting plaintiffs had revised their plans per the request of the design committee. However, council referred plaintiffs' proposal back to the design committee with the admonition that the committee must establish firm design guidelines regarding the use of steel structures before this proposal would be given further consideration. In referring this proposal back to committee, council did not permit plaintiffs, Bush or any others in attendance to address council or present any material for council's consideration.[17]

In an effort to provide council with an opportunity to evaluate plaintiffs' proposal, Bush arranged with Horace McLain, architect for the pharmacy proposed for parcel 4b, and James Olsavsky, architect for the Dollar Bank proposed for parcel 4a, to design a collaborative architectural plan of these parcels. The collaborative plan was presented to council members and city officials at an informal meeting on July 29, 1975. By letter of July 30, 1975 from Bray[18], plaintiffs learned that reaction to the collaborative plan had been favorable and that parcel 4c would be awarded to the plaintiffs provided they complied with this design. Bray's letter again emphasized that council and the administration did not oppose steel structures per se, but were only concerned with the exterior appearance of the building and the overall aesthetic appeal of the NDP area.

Plaintiffs, Bush and Randy Ellington, plaintiffs attorney, further met, informally, with council members and city officials on September 30, 1975. It is not clear, how-

17. At the June 12, 1975 design committee meeting Ron Theis, developer of parcel 4b, requested and was granted permission to erect a steel building instead of his previously proposed brick building. The Theis proposal was presented to council with plaintiffs proposal on June 18, 1975, and was also referred to the design committee. Theis subsequently elected to erect a brick building per his original proposal, and was awarded parcel 4b on July 16, 1976.

18. Joint Exhibit 3, Item 39.

ever, as to what transpired at this meeting beyond a general review of plaintiffs plans.

On October 14, 1975 Randy Ellington again presented plaintiffs' proposal to council members and city officials. The only plan revision suggested to plaintiffs at this meeting was that the screenwall at the rear of plaintiffs' building be a masonry structure. Plaintiffs agreed to this revision, and to make all reasonable revisions requested by council. Following this discussion City Solicitor Milton Shaker, departing from the question of design for the first time, suggested that an office complex would be a more appropriate land use for parcel 4c.

On October 15, 1975, council again formally addressed the disposition of parcel 4c. At this meeting it was brought to council's attention that other developers had recently become interested in acquiring parcel 4c. In view of this development council again deferred acting on the disposition of parcel 4c and set the matter for a second public hearing on November 12, 1975.

Plaintiffs and Michael Joseph, an attorney from Warren, Ohio, appeared before council on November 12, 1975 as prospective developers of parcel 4c. Prior to development proposals, however, Bray reported that at his request the city planning commission had met on November 10, 1975 to consider the proper land use for parcel 4c. Bray further reported that the consensus of the commission preferred 4c to be developed as an office complex.

Plaintiffs' proposal was presented by Randy Ellington. This proposal had been revised to comply with all requests of council which had been expressed at prior meetings. The revised proposal was calculated at a projected cost of $125,000 exclusive of land and site development.

Michael Joseph next presented his proposal for a brick office building with a mansard roof. Although Joseph's plans had

been seen by Solicitor Shaker prior to the November 12 meeting, the plans had apparently not been formally reviewed by the city planning commission or the urban design committee. Joseph did not present a calculated cost for his proposal.

On December 18, 1975 council awarded parcel 4c to Michael Joseph.[19] This action of council preceded any formal action on the part of the urban design committee regarding the Joseph proposal. The first consideration given to the Joseph proposal by the committee is reflected in the committee minutes of January 30, 1976.[20] At this meeting the committee deferred making any determination pending the submission of a more detailed site plan. The requested submission was considered and approved by the committee on February 25, 1976.[21]

### (d) Relocation Assistance—II

Subsequently to the awarding of parcel 4c to Joseph, plaintiffs were contacted by Bray regarding further relocation assistance.[22] At this time parcels 1b(c), 2, 2b or 2c had not been awarded to developers. Council had been approached, however, by John Paulette regarding the acquisition of portions of parcels 2b and 2c. Mr. Paulette is the owner of the Rec Room, a competitor of the Spot Restaurant, and was considering the acquisition in order to expand the Rec Room facilities.[23] Further, although parcel 2 had not been awarded to a developer, council had designated that parcel for use as municipal parking.

Plaintiffs considered and rejected these parcels as relocation sites. Although various factors, which will be discussed below, entered into plaintiffs' rejection of these parcels, the key consideration was that these parcels would not generate enough business to absorb the costs incident to the construction of plaintiffs own facilities.[24]

**19.** Joint Exhibit 3, Item 49.

**20.** Joint Exhibit 3, Item 53.

**21.** Joint Exhibit 3, Item 57.

**22.** Joint Exhibit 3, Item 51.

**23.** Joint Exhibit 3, Item 44.

**24.** See testimony of Lois Battison.

Parcels 2b and 2c were unacceptable as being immediately adjacent to a competitor. Further, pursuant to the applicable building and zoning requirements plaintiffs would be required to erect their building with a 10 foot set back from the street, and with adequate parking facilities. Such a set back would seriously detract from the exposure of a restaurant on these parcels. Additionally, as the Rec Room has no parking area, any such facilities constructed by the plaintiffs would inure to the benefit of the Rec Room as well as the Spot.

Parcel 1b(c) was unacceptable because of its close proximity to the Rec Room and the Dairy Queen, and its lack of immediate exposure to downtown Niles. Additionally, plaintiffs were again confronted with the fact that this parcel is within 500 feet of a church.[25] Parcel 1b(c) subsequently came on for public hearing on April 21, 1976. However, it is not clear as to what disposition was made of this parcel.

Parcel 2 was unacceptable for the plaintiffs' relocation needs as it is removed from the downtown area and the main traffic flow,[26] and is in close proximity to the Rec Room. Further, parcel 2 had been designated by council to be used for municipal parking.

### (e) Council, Land Use, Preference

Council's actions in denying plaintiffs parcel 4c were politically motivated.[27] The events surrounding the disposition of parcel 4c and the other NDP parcels demonstrate that plaintiffs' proposal was denied because counsel resented the controversy over parcel 4c. This resentment was fostered by plaintiffs' adamant position regarding the erection of a steel structure, the wide publicity which the controversy received in local papers, and by inquiries into the disposition of parcel 4c, at plaintiffs' request, by Congressman Charles J. Carney and HUD.[28] Council's actions must further be considered in view of the fact that five council members had previously been defeated in their bid for reelection in the May primaries. Council directly attributed this defeat to unfavorable reflections from the urban renewal program.[29]

Council awarded parcel 4c to Joseph on the basis that an office complex had always been council's preferred use for the parcel. However, council's actions were in no way consistent with this preference.

Had council desired to develop parcel 4c as an office complex it could have designated parcel 4c for such use.[30] It did not. Council designated parcel 4c to be used for office or commercial use.

Prior to October 14, 1975 plaintiffs were never notified of any objection to their proposed use of parcel 4c. Plaintiffs had presented council with elevations, site plans, and floor plans. These submissions depicted a modern tavern/restaurant. Neither council nor any city official disputed this fact nor inquired as to it. Every indication that plaintiffs received was to the effect that parcel 4c would be awarded to them upon their plans being approved by the urban design committee. The most notable of these indications was Bray's letter of July 30, 1975 to the plaintiffs. Although this letter may not have been an official statement of council's position, the statements contained therein were never repudiated by members of council at subsequent meetings; even though all members of council and all city officials received a copy of this letter.

The only objection to plaintiffs' proposed use of parcel 4c prior to October 14, 1975 is

---

25. Joint Exhibit 3, Item 44.

26. The evidence adduced at trial demonstrates that the traffic flow past 2, 2b and 2c is substantially less than the flow past 4c. See defendant Exhibit 13; testimony of Gene Bray.

27. See eg. testimony of Fremont Camarino and Randy Ellington.

28. See eg. plaintiffs' Exhibits 2, 3, 5–9, 17; defendants' Exhibits 4, 5, 10, 11, 12; Joint Exhibit 3, Items 25, 44, 54, 66; minutes of council meeting 6/18/75.

29. See minutes of council meeting, 6/18/75.

30. Joint Exhibit 3, Item 1.

found in a contact report filed by Bray.[31] This report relates a meeting between Bray, Mayor William Thorp and Councilman Palmer Gentile at which Bray suggested that land use was part of council's objection to plaintiffs' proposal. According to this report Mayor Thorp and Councilman Gentile expressed interest in this suggestion, and indicated they would propose to their associates that land use be considered in evaluating development proposals. However, Bray's testimony is very ambiguous regarding the time and place of this meeting, and whether the meeting was in person or by telephone. Bray's testimony is just as ambiguous as to when he actually prepared this report. Further, although Mayor Thorp and Councilman Gentile attended subsequent meetings regarding parcel 4c, neither these individuals nor anyone else, prior to October 14, 1975, ever expressed any objection to plaintiffs' proposed use of this parcel.

Plaintiffs expected to be awarded parcel 4c upon satisfying the aesthetic requirements of the urban design committee. As council repeatedly stressed that it had no *per se* objections to the use of steel in NDP development, and plaintiffs were continuously advised that they would be awarded parcel 4c upon complying with aesthetic requirements, these expectations were not unreasonable.

The suspect nature of council's actions is further demonstrated by the subjective fashion in which urban design committee approval was required as a condition precedent to a parcel being awarded to a developer. Although plaintiffs were required to comply with aesthetic requirements and to obtain design committee approval, in certain instances council awarded NDP parcels to developers who had received only conditional approval from the design committee.[32] Further, council awarded parcel 4c to Joseph prior to the time his plans had even been considered by the urban design committee. Council's actions evidence that there was no consistent application of aesthetic requirements to prospective developers of the NDP.

Since the very outset of the NDP council had followed a policy of extending a preference to displaced businesses which desired to relocate within the NDP area.[33] The relocation of such businesses within the NDP area was of principal concern to council.[34] Although this policy was never expressed through an ordinance or resolution, it was recognized by council and formally acted upon in awarding NDP parcels to developers.[35] However, council did not follow this policy with regard to the plaintiffs. Council promptly awarded parcel 4c to Joseph following the November 12, 1975 public hearing. Although there were other NDP parcels available that were suitable for being developed as an office complex,[36] council did not pursue this alternative with Joseph in an attempt to accommodate all parties concerned. By these actions council violated established policy, and did not afford plaintiffs any preference as a displaced business.

## II. CONCLUSIONS OF LAW

Pursuant to 42 U.S.C. § 1455,[37] relocation assistance must be provided to businesses displaced by the NDP. This section provides in pertinent part:

42 U.S.C. § 1455

---

31. Joint Exhibit 3, Item 34.

32. See minutes of council meeting 5/7/75; Joint Exhibit 3, Item 29.

33. See eg. Joint Exhibit 28; plaintiffs' Exhibits 16, 18.

34. Council criticized Henderson as a relocation director because he relocated too many businesses outside the NDP area. See minutes of council meeting, 10/1/75.

35. See eg. testimony of Fremont Camarino, Gene Bray and Robert Henderson; Joint Exhibit 3, Items 29, 37, 44.

36. Parcel 1b(b) was developed as an office complex subsequent to council's awarding parcel 4c to Joseph.

37. National Housing Act of 1949.

(c)(1) . . . [T]here [shall] be established . . . for each urban renewal project involving the displacement of individuals, families, and business concerns occupying property in the urban renewal area, a relocation assistance program which shall include such measures, facilities, and services as may be necessary or appropriate in order (A) to determine the needs of such individual, families, and business concerns for relocation assistance; (B) to provide information and assistance to aid in relocation and otherwise minimize the hardships of displacement . . .; and (C) to assure the necessary coordination of relocation activities with other project activities and other planned or proposed governmental actions in the community which may affect the carrying out of the relocation program . . ..

(3) Within one year after the date of the enactment of this paragraph [Dec. 24, 1969], and every two years thereafter, the Secretary shall review each locality's relocation plan under this subsection and its effectiveness in carrying out such plan.

██ The provisions of 42 U.S.C. § 1455 must be considered in conjunction with those of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 *et seq.*[38] The relevant provisions of this Act are set forth in 42 U.S.C. § 4630, which provides in pertinent part:

42 U.S.C. § 4630

Notwithstanding any other law, the head of a Federal agency shall not approve any grant to, or contract or agreement with, a State agency, under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person . . . unless he receives statutory assurances from such State agency that—

(2) relocation assistance programs offering the services described in section 205 [42 U.S.C. § 4625] shall be provided to such displaced persons.

The applicable provisions of 42 U.S.C. § 4625 provide:

42 U.S.C. § 4625

(c) Each relocation assistance advisory program . . . shall include such measures, facilities, or services as may be necessary or appropriate in order to—

(1) determine the need, if any, of displaced persons, for relocation assistance;

(2) provide current and continuing information on the availability, prices and rentals . . . of comparable commercial properties and locations for displaced businesses;

(4) assist a displaced person displaced from his business . . . in obtaining and becoming established in a suitable replacement location.

(6) provide other advisory services to displaced persons in order to minimize hardships to such persons in adjusting to relocation.

Pursuant to these sections, defendant Secretary Hills is prohibited from entering into a contract for loans or capital grants with a local public agency absent satisfactory assurances from the agency that adequate relocation assistance will be provided. Further, upon entering into such a contract defendant Hills shall periodically review the agency's relocation plan and its effectiveness in carrying out such plan.

██ The Court's function in reviewing the Secretary's determination that a local agency's relocation assurances are satisfactory is limited to ascertaining whether the Secretary has acted in apparent good faith, reasonably rather than arbitrarily, and with some factual basis for her decision. See eg.

---

**38.** 42 U.S.C. § 1455 was formerly implemented by 42 U.S.C. § 1465. The Uniform Relocation Assistance and Real Property Acquisition Poli- cies Act of 1970 replaced 42 U.S.C. § 1465. See *Barnes v. Tarrytown Urban Renewal Agen- cy,* 338 F.Supp. 262 (S.D.N.Y.1971).

*Western Addition Community Organization v. Romney*, 320 F.Supp. 308 (N.D.Cal.1969). The requirement of satisfactory assurance does not mean an absolute certainty of the factual situation in question. Such assurance means that the subject matter, considering the appearances, reasonably seems to be sure, although eventually it could be found not to be so. See eg. *Western Addition Community Organization v. Romney, supra.*

■ In view of these standards, Secretary Hills cannot be said to have acted arbitrarily or in bad faith. The Secretary required and obtained satisfactory assurances from Niles regarding relocation assistance. Further, the Secretary, in accordance with the applicable statutes, assisted Niles in its relocation efforts, and reviewed the effectiveness of such efforts. Every indication received by the Secretary, both before and after the disposition of parcel 4c, was to the effect that there were suitable relocation sites available to the plaintiffs. The Secretary never received such notice of the true controversy between council and plaintiffs, as to have required direct relocation assistance from HUD in addition to that which was rendered. Accordingly, the Court finds that the plaintiffs were not denied effective relocation assistance by defendant Carla Hills.

Plaintiffs instituted this action against the City of Niles and the Niles Community Development Agency, successor agency to the NURA. Plaintiffs, however, have not presented any evidence which indicates that they have been denied relocation assistance by the Agency. The gravamen of plaintiffs' claims, and the evidence adduced at trial, is directed at the actions of council.[39]

■ In reviewing the actions of council the Court will apply those standards prescribed by state law. See *Guran Co. Inc. v.*

*City of Akron*, 546 F.2d 201 (6th Cir. 1976). Generally, a city council acting in respect to an urban renewal plan is engaged in the performance of a governmental function, and cannot be held liable for such acts. *Gibson & Perin Co. v. City of Cincinnati*, 480 F.2d 936 (6th Cir. 1973); *Eikenbary v. City of Dayton*, 3 Ohio App.2d 295, 210 N.E.2d 402 (1964). An exception to this proposition is where council acts in bad faith or in an arbitrary and capricious fashion. See *Cleveland Stevedore Co. v. City of Cleveland*, 16 Ohio Misc. 91, 241 N.E.2d 290 (1968); *Eikenbary v. City of Dayton, supra; Grisanti v. City of Cleveland*, 89 Ohio L.Abs. 1, 181 N.E.2d 299 (Ohio App.1962).

■ In denying plaintiffs parcel 4c, council exceeded the scope of its authority and acted in an arbitrary and capricious manner. Plaintiffs' proposal was compatible with the use for which parcel 4c was designated. Further, council was cognizant of the requirements of plaintiffs' business, and empowered to provide the necessary relocation assistance. Council, however, chose not to relocate plaintiffs on parcel 4c. Council actions in this regard were prompted by political motives rather than proper legislative concerns. In so acting council abused its discretion, and denied plaintiffs effective relocation assistance. Cf. *Merge v. Sharott*, 341 F.2d 989 (3d Cir. 1965); *Adair v. Nashville H. Auth.*, 388 F.Supp. 481 (M.D.Tenn.1974).

Council's actions have imposed such conditions on the plaintiffs as to make it economically impracticable for plaintiffs to relocate their business. By these actions, council has further denied plaintiffs effective relocation assistance. See *M. M. Crockin Co. v. Portsmouth Redevelopment & H. Auth., supra; Cy Ellis Raw Bar v. D. C. Redevelopment Land Agency*, 139 U.S.App. D.C. 385, 433 F.2d 543 (1970); *Home Furni-*

---

**39.** As council was responsible for the ultimate disposition of all NDP parcels, plaintiffs claims

are cognizable as to it. Cf. *Gibson & Perin Co. v. City of Cincinnati, supra.*

*ture Co. of Charlotte v. HUD,* 324 F.Supp. 1401 (W.D.N.C.1971).[40] Plaintiffs have not only been denied parcel 4c, but also those potential relocation sites which were disposed of during the interim in which plaintiffs attempted to acquire parcel 4c.[41] Those sites which were available to plaintiffs after November 15, 1975 were not economically conducive to relocation by redevelopment.

 Finally, council denied plaintiffs effective relocation assistance by not affording them the relocation preference which was extended to other businesses displaced by the NDP. Cf. *Cy Ellis Raw Bar v. D. C. Redevelopment Land Agency, supra; Otero v. New York City H. Auth.,* 344 F.Supp. 737 (S.D.N.Y.1972). Plaintiffs were entitled to expect that they would be treated in the same fashion as other displaced businesses, and to rely on those expectations in their relocation efforts. In deviating from its established policy, council frustrated these expectations, treated plaintiffs in a disparate fashion, and denied them effective relocation assistance.

## III. CONCLUSION

Through the action of its council the City of Niles has denied plaintiffs effective relocation assistance. The Court, therefore, enjoins the City of Niles from conveying parcel 4c to anyone other than the plaintiffs. The Court further enjoins Carla Hills and the Department of Housing and Urban Development from authorizing, approving, or ratifying the sale of parcel 4c to anyone other than the plaintiffs.

IT IS SO ORDERED.

Appendix to follow.

---

**40.** See also, *Smith v. Missouri State Highway Commission,* 488 S.W.2d 230 (Mo.App.1972).

**41.** At least two relocation sites, parcel 1a and the Arden Furniture Store, which plaintiffs had considered prior to deciding on parcel 4c were disposed of during this period.