Frank **PIETRONIRO**, Vice-President of Piet Corporation; Mary Pietroniro, President of Piet Corporation; and Piet Corporation

v.

**BOROUGH OF OCEANPORT, NEW JERSEY, and Louis J. Sylvain, and Nicholas Leone, and George Barrett, and Clement Sommers, and Elwood L. Baxter**

v.

**UNITED STATES of America, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Third Party Defendant.**

Frank **PIETRONIRO**, Mary Pietroniro

v.

George **BARRETT.**

Frank **PIETRONIRO**, Mary Pietroniro

v.

Clement V. **SOMMERS.**

Frank **PIETRONIRO**, Mary Pietroniro

v.

Elwood L. **BAXTER.**

Frank **PIETRONIRO**, Mary Pietroniro

v.

Nicholas **LEONE**, Borough of Oceanport, New Jersey, Louis J. Sylvain, and Nicholas Leone, and George Barrett, and Clement Sommers, and Elwood L. Baxter, Appellants.

No. 83–5926.

United States Court of Appeals, Third Circuit.

Argued March 19, 1985.

Decided June 18, 1985.

Rehearing and Rehearing In Banc Denied July 18, 1985.

Theodore W. Geiser (argued), John F. Neary, Connell, Foley & Geiser, Newark, N.J., for appellants.

Cynthia J. Liebling (argued), Liebling & Liebling, Gautier, Miss., Joseph F. Mattice, Asbury Park, N.J., for appellee.

Before SEITZ, HIGGINBOTHAM, Circuit Judges and GILES, District Judge[*].

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Piet Corporation ("Piet"), a New Jersey corporation, brought this action for damages, and declaratory and injunctive relief under 42 U.S.C. § 1983 (1982) against the Borough of Oceanport ("Oceanport") New

---

[*] Honorable James T. Giles, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Jersey and certain public officials who were administering Oceanport's urban renewal program.[1] Piet, through its sole shareholders and corporate officers—Frank and Mary Pietroniro—charged that the defendants illegally deprived them of property by their failure to provide effective relocation assistance as required by the Housing Act of 1949, 42 U.S.C. § 1455(c)(1) (1982), the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4625 and the applicable federal regulations, 24 C.F.R. § 42.1 *et seq.* (1971). A jury rendered a verdict for the plaintiffs for $197,-950.00. The district court entered judgment and denied the defendants' motion for judgment notwithstanding the verdict and alternative motion for a new trial. Despite the complexity and novelty of the issues in this case, the district court filed no opinion, either oral or written, to explain the basis for his denial of the post-trial motions. Because we find, as a matter of law, that the evidence was insufficient to support the conclusion that Piet was denied relocation assistance as required by law, we now reverse the judgment of the district court.

## I.

Piet Corporation owned and operated a combination package store, bar, and tenement business (consisting of three apartments) in Oceanport, New Jersey from July of 1961 until July of 1975. The Piet property was located in the downtown business district which in 1972 was a blighted area that consisted of several small businesses, a few gas stations, and abandoned properties.

Defendant Elwood Baxter became Mayor of Oceanport in 1972, and the Oceanport Council then included defendants George Barrett and Clement Sommers. Sommers became Councilman in 1960 and remained a Councilman until January 1, 1976, when he replaced Baxter as Mayor. Barrett served as Councilman until 1978. The offices of

Mayor and Councilman were part-time positions paying a salary of $250 per year.

Beginning in February of 1972, the Council held public hearings concerning urban renewal proposals. Frank Pietroniro attended at least one such hearing on behalf of Piet. The Borough of Oceanport approved an urban renewal plan in June 1972, and in September the program received Department of Housing and Urban Development ("HUD") approval and became operational under the Neighborhood Development Program, Project No. NJA–15.

The Mayor and Council served as the Local Public Agency ("LPA") for the administration of the Neighborhood Development Program ("NDP"). Baxter, as Mayor, served as the initial Chairman and Barrett and Sommers served as members. Baxter had no vote at Council meetings except in the event of a tie. As chairman of the LPA he did have a vote.

The LPA delegated the day-to-day administration of the Oceanport NDP to the "Oceanport Redevelopment Agency", which later became the "Oceanport Office of Community Development". In October, 1972 the LPA hired defendant Louis Sylvain as Executive Director of the Redevelopment Agency; he served in that capacity until May, 1980. The defendant Nicholas Leone was hired in April, 1973 as Relocation Officer and shortly thereafter was made Assistant Director. In 1976 Leone ceased his involvement in the program. HUD monitored the program.

The urban renewal plan called for the demolition of several properties, including Piet's. Eighteen businesses and forty residences were displaced. The former business district was rezoned for residential use. Negotiations between the Borough and Piet over the removal and relocation of the business began in 1973 and have been the source of much controversy and hostility among the parties. Since the implementation of the NDP there have been disputes over the adequacy of the compensation offered for Piet's real property, allegations of official harassment, conspiracy and un-

---

**1.** Third party defendant, United States Department of Housing and Urban Development was granted summary judgment on March 30, 1981 and is not a party to this appeal.

ethical conduct, and charges that the relocation assistance provided by the Borough as required by federal law was a "sham" designed to obscure the machinations of "sinister" political plots.

At the time of its eviction on July 2, 1975, Piet had received from Oceanport $95,885.13 in displacement payments, including a $58,225.00 (plus interest) award for the land and building as determined by a judgment in state court condemnation proceedings. Piet did not receive compensation for the value of its liquor license or the licensing fee, but was allowed to retain the license in order to relocate the business or, in the alternative, sell it to a suitable party.[2]

## II.

■ A claim for damages resulting from the destruction of a business is an appropriate action under 42 U.S.C. § 1983. Where a party seeks to compel compliance with conditions set forth in a federal statute, however, we must first determine whether the statute at issue provides for a private cause of action to compel state compliance with those conditions, or whether the appropriate remedy is an action by the federal government to terminate funds provided to the state under the act. *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 27–28, 101 S.Ct. 1531, 1544–45, 67 L.Ed.2d 694 (1981).

Piet cites four sources of Federal law as conferring upon it certain interests that are rights protected by 42 U.S.C. § 1983: the Housing Act of 1949, 42 U.S.C. § 1455(c)(1);[3] the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA"), 42 U.S.C. § 4625;[4] HUD regulations 24 C.F.R. §§ 42.100, 42.105, 42.-

---

**2.** Piet owned a Broad "C" liquor license. Broad "C" licenses are the most valuable class of liquor license in New Jersey because it allows the licensee to sell both over-the-counter drinks and package goods. Piet's expert witness testified at trial that this license is currently worth $100,000 if a suitable location can be found. In the ten years since its eviction, Piet has neither relocated nor sold the license and continues to pay a yearly licensing fee to the State of New Jersey. Although a 1978 law passed by New Jersey automatically retires dormant licenses after one year, Piet has successfully enjoined enforcement of this statute pending final disposition of this case.

**3.** 42 U.S.C. § 1455(c)(1) provides in pertinent part:

... [T]here [shall] be established ... for each urban renewal project involving the displacement of individuals, families, and business concerns occupying property in the urban renewal area, a relocation assistance program which shall include such measures, facilities, and services as may be necessary or appropriate in order (A) to determine the needs of such individuals, families, and business concerns for relocation assistance; (B) to provide information and assistance to aid in relocation and otherwise minimize the hardships of displacement ...; and (C) to assure the necessary coordination of relocation activities with other project activities and other planned or proposed governmental actions in the community which may affect the carrying out of the relocation program....
(3) Within one year after [the date of the enactment of this paragraph] Dec. 24, 1969,

and every two years thereafter, the Secretary shall review each locality's relocation plan under this subsection and its effectiveness in carrying out such plan.
42 U.S.C. § 4630 similarly requires:
Notwithstanding any other law, the head of a Federal agency shall not approve any grant to, or contract or agreement with, a State agency, under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person ... unless he receives satisfactory assurances from such State agency that—
(2) relocation assistance programs offering the services described in [42 U.S.C. § 4625] shall be provided to such displaced persons.

**4.** 42 U.S.C. § 4625 provides in pertinent part:
(c) Each relocation assistance advisory program ... shall include such measures, facilities, or services as may be necessary or appropriate in order to—(1) determine the need, if any, of displaced persons, for relocation assistance;
(2) provide current and continuing information on the availability, prices, and rentals ... of comparable commercial properties and locations for displaced businesses;
(4) assist a displaced person displaced from his business ... in obtaining and becoming established in a suitable replacement location;
(6) provide other advisory services to displaced persons in order to minimize hardships to such persons in adjusting to relocation.

115 (1971); and the HUD Relocation Handbook. These require municipalities which receive federal subsidies for urban renewal projects to provide a relocation assistance program for businesses displaced by the project.

█ This regulatory scheme does not, however, provide a mechanism by which the federal administrative authority charged with enforcing these conditions on the state—HUD—can appropriately investigate and respond to the claims raised by persons in Piet's position. The grievance and appeals procedure set out in 24 C.F.R. § 42.190 (1971) provides only for HUD reconsideration of state agency determinations as to relocation *payments* under the regulations. In the absence of a comprehensive enforcement scheme within the regulatory scheme which encompasses the plaintiff's complaint there exists a private cause of action against state officials for violations of the Housing Act and the URA. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). *See also Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 19–21, 101 S.Ct. 2615, 2625–27, 69 L.Ed.2d 435 (1981).

█ Nor is the claim barred by a failure by plaintiffs to exhaust federal administrative remedies. Where administrative channels are inadequate to resolve issues which are within the expertise of courts, a party is not required to exhaust administrative review. 4 K. Davis, *Administrative Law Treatise,* § 26.11 (1983). So long as HUD approves the program established by the LPA, there is no procedure designed to redress allegations that the program is being administered improperly. Indeed, in response to Piet's complaints in this case the director of HUD's Community Planning Development Division denied Piet's request for a hearing on the issue of relocation assistance because the amount of relocation *payments* was not in dispute, and the LPA had assured HUD that it had provided maximum assistance in the form of referrals to realtors and possible relocation

sites. There is no suggestion in the laws or regulations that the program's administration is a matter of agency discretion, nor is judicial review precluded. Where judicial review is not precluded in the first instance, the agency's actions are not discretionary, and the administrative channels which exist are inadequate to resolve a complainant's grievance, a party is not required to exhaust all avenues of administrative review before bringing the matter to federal court. *M.M. Crockin Co. v. Portsmouth Redevelopment and Housing Authority,* 437 F.2d 784, 788 (4th Cir.1971); *cf. Tokarcik v. Forest Hills School District,* 665 F.2d 443, 447 n. 5 (3d Cir.1981).

### III.

An inherent *sequela* of urban renewal is that there will not be absolute replication of what previously existed. There are some losses in the process. Our constitution requires that persons evicted from their property by the government for purposes in the public good be fully compensated for their loss. Condemnation is the usual remedy in such cases. Relocation assistance is a supplement and, though an important option, is not a guarantee of relocation for affected businesses. The Housing Act and the URA do not require that the government "tender" or "obtain" a replacement location; they require "only assistance, not assistance guaranteeing a successful result." *American Dry Cleaners and Laundry v. United States Department of Transportation,* 722 F.2d 70, 73 (4th Cir.1983).

To minimize hardship and assure that individuals will not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole, Congress has required that owners of real property which is acquired for federally funded or assisted urban renewal projects be provided certain relocation assistance.[5] To implement these objectives, HUD pro-

---

**5.** *See* 42 U.S.C. § 1455 & 42 U.S.C. § 4625, notes 3–4 *supra.*

mulgated a series of regulations, codified at 24 C.F.R. § 42.1 *et seq.* (1971).[6]

The regulations require that states receiving federal funds for urban renewal develop and implement a relocation assistance advisory program which provides "maximum assistance, to minimize the hardships of displacement." 24 C.F.R. § 42.105. Among other things, these regulations established the minimum requirements of relocation assistance advisory programs. 24 C.F.R. § 42.115. All property owners are not, however, entitled to the same assistance. Resident displacees are assured that "within a reasonable period of time prior to displacement, there *will be* available adequate replacement housing ... equal in number to the number of and available to, such eligible persons who will be displaced." 24 C.F.R. § 42.115(d) (emphasis added). Displaced business concerns are not guaranteed a replacement site. The public agency is obligated to do no more than "provide current and continuing information on the availability ... of comparable commercial properties and locations" and to "assist any such eligible person displaced from his business ... in obtaining and becoming established in a suitable replacement location." 24 C.F.R. § 42.115(c) & (e).[7]

The district court accurately and exhaustively instructed the jury on the law regarding effective relocation assistance. The question before us is whether "as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Patzig v. O'Neil,* 577 F.2d 841, 846 (3d Cir.1978). After careful review of the record, viewed in the light most favorable to plaintiffs, we conclude that the evidence was insufficient to support the jury's verdict.[8] It is not disputed that Oceanport implemented a relocation plan, including a relocation advisory assistance program, that was approved and monitored by HUD. The parties have further stipulated that Piet was referred to five alternative locations and several local realtors by the LPA in their attempts to relocate the business. Conceding, as it must, that as a commercial displacee it was not guaranteed a replacement property under federal law, Piet nevertheless contends that the LPA failed to provide the "maximum assistance" required by § 42.105. This claim is based on two somewhat intertwined theories.

In the first instance Piet asserts that none of the locations to which it was referred by the LPA were economically feasible.[9] In fact, Piet believes that there is only one feasible alternative location in Oceanport, namely the so-called "Ratti Tract" which lies virtually across the street from Piet's former location. The virtues of

**6.** The original regulations as promulgated in 1971 govern this case and all displacements occurring before 1979. Except where noted, all subsequent citations to HUD regulations are to the 1971 versions. The updated regulations, codified in 1979, do not apply to pre-1979 displacements. *See* 24 C.F.R. § 42.3 (1979).

**7.** *See also* § 42.105 which states:

State agencies shall develop and implement a relocation assistance advisory program which satisfies the requirements of § 42.115 and of title VI of the Civil Rights Act of 1964 and title VIII of the Civil Rights Act of 1968. Such program shall be administered so as to provide advisory services which offer maximum assistance, to minimize the hardship of displacement, and to assure that (a) *all persons displaced from their dwellings are relocated into housing meeting the criteria described in § 42.120, and (b) all persons displaced from their places of business or farm operations are assisted in reestablishing with a minimum of delay and loss of earnings.* (Emphasis added.)

These requirements are reiterated in a Relocation Handbook published by HUD in 1971 which also contains guideforms designed to facilitate compliance with the federal regulations.

**8.** Piet sought to recover for diminished value of the liquor license, license fees paid, lost profits, and for personal injury (an ulcer) suffered by Frank Pietroniro. As all of these damages were allegedly caused by breach of the statutory duty to provide relocation assistance, and no other statutory or common law causes of action are advanced, the entire verdict depends on the finding of a breach of the statutory duty.

**9.** Piet calculates "economic feasibility" by weighing the necessary investment against anticipated revenues from operating a taproom and package store on the site.

the Ratti Tract in Piet's view are that it is initially affordable and favorably situated so as to provide a volume of business that will make the new venture economically feasible. The only stumbling block to a satisfactory resolution of Piet's problem is the undisputed fact that the Ratti Tract has been zoned for residential use and Piet has been advised that the Oceanport Board of Adjustment would refuse to grant a commercial variance to accommodate Piet's liquor license.

We agree that a displaced business should be given an opportunity to establish that the public authority has failed to comply with both the federal regulations and its own relocation plan when it refuses to make available the only parcel of land allegedly feasible for the relocation of a business. *M.M. Crockin Co. v. Portsmouth Redevelopment and Housing Authority, supra.* As *Crockin* noted, the legality of the relocation program in this type of case should be considered in light of whether the public authority had the ability to grant the assistance requested; whether the proposed use for the site comports with the use for which the parcel is designated in the urban renewal plan; and whether the authority's proposed use is compatible with that plan.

Piet's claim fails under these criteria. Since Piet's proposed use was incompatible with the use for which the Ratti Tract was designated, the LPA cannot be faulted for failing to refer Piet to that location. Moreover, it is undisputed that Piet was well aware of the unavailability of the Ratti Tract, and had been so informed by the LPA, which also informed Piet that it was unlikely a liquor license could be relocated on the site because of the zoning restrictions. In addition, the LPA was powerless to provide Piet with any more assistance.

Only the Oceanport Board of Adjustment could grant the zoning variance necessary for Piet to relocate on the Ratti Tract.[10] Finally, Piet relies on the fact that the ultimate purchasers of a parcel on the Ratti Tract, two doctors who had also been displaced by the urban renewal project, were granted a commercial variance in order to erect a commercial building for the site on which they located their offices.[11] While we agree that Piet was entitled to the same considerations with regard to relocation assistance as any other commercial displacee, we cannot impute any discrimination made by the zoning board to the LPA. Moreover, it is well within the discretion of the municipal zoning board to grant a variance that allows doctors' offices to be located in a residential area, and not a bar and a liquor store. In these circumstances, we do not believe that the jury could reasonably find that failure to refer Piet to the Ratti Tract amounted to a failure to provide relocation assistance required by law.

Piet's second theory presents us with a somewhat closer case. It is alleged that the defendants acted in bad faith in the administration of the urban renewal program. There is evidence that indicates that during the 1972 public hearings Mayor Baxter and others misrepresented to those in attendance that the urban renewal plan contemplated allowing certain existing businesses to remain in the redeveloped zone. There is further testimony that Piet was the target of official harassment during its eviction proceedings and that the LPA and the Office of Community Development violated various HUD regulations in the administration of the relocation plan. Additionally, there is evidence that several of the sites to which Piet was referred for relocation were clearly incompatible with

---

**10.** The Oceanport Board of Adjustment was an independent entity which was not subservient to the LPA. During the time relevant to this case the two bodies shared no common members and no member of the Board of Adjustment is an individual defendant here.

**11.** Since Piet did not bid for the Ratti Tract parcel sold to the doctors, it could not apply for

a variance. Thus, it never applied for and was thus never denied a commercial variance for the Ratti Tract. In effect Piet alleges here that its desire to purchase the property was chilled because municipal officials made it known that a variance would not be granted to permit the location of the liquor license.

his needs. For example, two sites were located on tidal lands that regularly flooded and which could not be filled due to a statewide moratorium prohibiting the filling of waterfront properties. Most troublesome however, is the evidence that some of the defendants may have used their positions of public trust for private advantage. In 1980 Mayor Sommers purchased an inactive liquor license from the Monmouth Park Jockey Club. It is alleged that he was able to negotiate a bargain purchase price because there were several inactive liquor licenses in Oceanport, including Piet's, which were soon to be retired under New Jersey law if they were not put into active use. Thus it is alleged that Sommers benefitted directly from Piet's failure to relocate. There is other testimony that defendant Leone and defendant Barrett, who was in the real estate business, proposed that Piet sell his license at a deflated price to one of Barrett's clients.

The thrust of these accusations is that the defendants' actions with regard to Piet were prompted by private and political motives that made it impossible for Piet to receive adequate relocation assistance. While we recognize that there have been cases in which it was found that effective relocation assistance was not provided where public officials acted pursuant to political motivations rather than proper legislative concern, *see Battison v. City of Niles, Ohio*, 445 F.Supp. 1082 (N.D.Ohio 1977), this case lacks the necessary causal nexus between the defendants' conduct and the plaintiff's damage. Most significantly, Piet concedes that it knows of no feasible alternative location in Oceanport to which it was not referred by the LPA, and admits that the only acceptable location was a residential parcel. As we stated earlier, the understandable decision to allow a doctors' office rather than a bar to locate in a residential neighborhood is not an abuse of the municipality's discretion. Absent some evidence that the defendants did not provide Piet with assistance in obtaining an existing suitable location, there is no basis for finding that there has been a failure to provide the relocation assistance mandated

by federal law. *See American Dry Cleaners and Laundry v. United States Department of Transportation*, 722 F.2d at 72–73.

### CONCLUSION

Because we find that the evidence is insufficient to support the jury's verdict, the judgment of the district court will be vacated with directions to enter a judgment in favor of the appellants. Each party to bear its own costs.